KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York  10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000
Thomas Moers Mayer
Robert T. Schmidt
Lauren M. Macksoud
Craig L. Siegel

*Counsel for the Official Committee*
*of Unsecured Creditors of Motors Liquidation Co.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------- X

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| | : | Case No.: 09-50026 (REG) |
| MOTORS LIQUIDATION COMPANY., *et al.*, | : | |
| f/k/a General Motors Corp., *et al.*, | : | (Jointly Administered) |
| | : | |
| Debtors. | : | |

--------------------------------------------------------- X

| | | |
|---|---|---|
| OFFICIAL COMMITTEE OF UNSECURED | : | |
| CREDITORS OF MOTORS LIQUIDATION | : | |
| COMPANY, *et al.*, | : | |
| Plaintiff, | : | |
| v. | : | Adversary Proceeding No. _____ |
| | : | |
| UNITED STATES DEPARTMENT OF THE | : | |
| TREASURY, EXPORT DEVELOPMENT | : | |
| CANADA, | : | |
| Defendants. | : | |

--------------------------------------------------------- X


## COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff, the Official Committee of Unsecured Creditors (the "**Committee**") of

the above-captioned debtors and debtors-in-possession in these chapter 11 cases (collectively, the

"**Debtors**"), seeks a declaratory judgment and alleges as follows upon personal knowledge and

information and belief:

## NATURE OF ACTION

1.     This is an adversary proceeding seeking a declaratory judgment that, under the DIP Order and Wind-Down Order (collectively, the "**Orders**") and the DIP Credit Agreement, (a) U.S. Treasury and EDC (the "**DIP Lenders**") are not entitled to any proceeds of the Term Loan Avoidance Action and have no interests in the Avoidance Action Trust, and (b) the holders of Allowed General Unsecured Claims have the exclusive right to receive any and all proceeds of the Term Loan Avoidance Action, and are the exclusive beneficiaries of the Avoidance Action Trust.[1]

2.     The Committee is entitled to such declaratory relief for at least two separate and independent reasons. ***First***, through the DIP Credit Agreement drafted by U.S. Treasury, and the Orders, which U.S. Treasury drafted and urged the Court to enter, the DIP Lenders ***released any and all claims*** they may have had against the Prepetition Term Lenders (defined below); ***excluded from the DIP Lenders' Collateral*** (as defined in the DIP Credit Agreement) any proceeds from the Term Loan Avoidance Action; and ***limited the DIP Lenders' recourse*** on the DIP Credit Agreement Claims solely to the DIP Lenders' Collateral. Thus, the Orders and the DIP Credit Agreement unambiguously provide that any proceeds of the Term

---

[1]     Unless defined otherwise herein, capitalized terms used herein shall have the meanings ascribed to them in the Debtors' Second Amended Joint Chapter 11 Plan (as amended, the "**Plan**") [Docket No. 9836]. "**DIP Order**" refers to (i) the Final Order Pursuant to Bankruptcy Code Sections 105(a), 361, 362, 363, 364 and 507 and Bankruptcy Rules 2002, 4001 and 6004 (A) Approving a DIP Credit Facility and Authorizing the Debtors to Obtain Post-Petition Financing Pursuant Thereto, (B) Granting Related Liens and Super-Priority Status, (C) Authorizing the Use of Cash Collateral and (D) Granting Adequate Protection to Certain Pre-Petition Secured Parties dated June 25, 2009 [Docket No. 2529]; "**Wind-Down Order**" refers to the Order Pursuant to Bankruptcy Code Sections 105(a), 361, 362, 363, 364 and 507 and Bankruptcy Rules 2002, 4001 and 6004 (A) Approving Amendment to DIP Credit Facility to Provide for Debtors' Post-Petition Wind-Down Financing dated July 5, 2009 [Docket No. 2969].

Loan Avoidance Action do not belong to the DIP Lenders and belong exclusively to the holders of Allowed General Unsecured Claims.

3.      **Second**, the DIP Lenders waived any purported claim to payment of the DIP Credit Agreement Claims from proceeds of the Term Loan Avoidance Action by having failed to disclose, and obtain the Court's approval of, any such purported claim as required by the Guidelines for Financing Requests of the Bankruptcy Court of the Southern District of New York.

4.      Consistent with the Plan and Confirmation Order, which provide that entitlement to the proceeds of the Term Loan Avoidance Action shall be determined either by mutual agreement between the Committee and U.S. Treasury or final court order, the Committee attempted to reach a settlement with U.S. Treasury.  Unfortunately, the Committee's attempts have not succeeded.

5.      The Court previously dismissed, without prejudice, a motion brought by the Committee relating to this subject matter as not ripe.  However, many of the facts that led the Court to its lack-of-ripeness decision are no longer present—the Debtors have consummated their Plan, which provides for the establishment of the Avoidance Action Trust, and U.S. Treasury's asserted administrative expense priority claim (which has no recourse to the Term Loan Avoidance Action) is not a barrier to confirmation.

6.      In addition, this dispute is ripe for resolution now because if the beneficiaries of the Term Loan Avoidance Action are not determined **_on or before_** the Avoidance Action Trust Transfer Date (i.e., December 15, 2011), then the holders of Allowed General Unsecured Claims would suffer unnecessary, adverse tax consequences if later they are deemed beneficiaries and receive proceeds from the Term Loan Avoidance Action.

7.    In short, § 6.5(n) of the Plan provides that if all the beneficiaries of the Avoidance Action Trust have not been identified on or before the Avoidance Action Trust Transfer Date, then for tax purposes the Avoidance Action Trust shall be treated as a "disputed ownership fund" or "complex trust", rather than as a "liquidating trust" taxed as a "grantor trust". This would cause any proceeds of the Term Loan Avoidance Action to be taxed twice—first, the Avoidance Action Trust would be taxed when claims under the Term Loan Avoidance Action are resolved, and second, holders of Allowed General Unsecured Claims would be taxed upon the receipt of distributions from the Avoidance Action Trust of Term Loan Avoidance Action proceeds.  This ***double taxation could be avoided***, and any proceeds taxed only at the beneficiary level, ***if the Avoidance Action Trust beneficiaries are determined before the Avoidance Action Trust Transfer Date***.

8.    Declaratory relief is warranted now also because it will serve a useful purpose by assisting the parties and the Avoidance Action Trust Administrator (the "**Administrator**") in formulating settlement positions and developing litigation and settlement strategy with respect to the Term Loan Avoidance Action. The Court has *sub judice* cross-motions for summary judgment in the Term Loan Avoidance Action.  Once the Court decides the cross-motions, under the Plan either the Committee (if the Court decides prior to the Avoidance Action Trust Transfer Date) or the Administrator, in consultation with the Avoidance Action Trust Monitor (the "**Monitor**")  (if the Court decides on or after that date) will need to decide what to do next—regardless whether they are the winning party (and face either a likely appeal or a trial on remaining issues of fact) or the losing party (and must determine whether to take an appeal).

- 4 -

9.      So long as the Term Loan Avoidance Action Beneficiaries remain undecided, the party entrusted with responsibility for prosecuting and resolving the Term Loan Avoidance Action will be severely hampered in its ability to determine the next step in the litigation.   That party cannot effectively determine what to do without first knowing the identity of the beneficiaries because an assessment of the risks of continuing to prosecute the Term Loan Avoidance Action, and the economics of settlement, vary significantly depending on whether the unsecured creditors or the DIP Lenders will get any proceeds of the litigation.

10.      Moreover, declaratory relief is warranted now because it will offer the parties relief from uncertainty, settle the rights of the parties to the proceeds of the Term Loan Avoidance Action, and may avoid additional litigation.

11.      Unlike the Committee, U.S. Treasury apparently does not have an incentive to resolve this dispute before the Avoidance Action Trust Transfer Date—either consensually or through judicial intervention—because U.S. Treasury bears no risk of harm from double taxation.   Any tax imposed on the Avoidance Action Trust that would theoretically be indirectly borne by U.S. Treasury were it deemed a beneficiary after the Avoidance Action Trust Transfer Date, would go right back into U.S. Treasury's pocket via the IRS.

12.      Accordingly, the Committee has an actual and substantial controversy with the DIP Lenders of sufficient immediacy and reality to warrant the declaratory relief requested herein.

### JURISDICTION AND VENUE

13.      On June 1, 2009, (the "**Petition Date**"), all Debtors with material assets filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, as

amended (the "**Bankruptcy Code**").   On March 29, 2011, the Court entered an order (the

"**Confirmation Order**") confirming the Plan.

14.     This is an adversary proceeding pursuant to Rules 7001 and 7003 of the

Federal Rules of Bankruptcy Procedure.

15.     The Court has original jurisdiction over this action pursuant to 28 U.S.C.

§ 1334(b), in that this is a civil proceeding arising in or related to cases under title 11 of the

United States Code.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

16.     Venue is proper in this Court pursuant to 28 U.S.C. § 1409.

### THE PARTIES

17.     The Committee was appointed on June 3, 2009, by the United States

Trustee to represent the interests of unsecured creditors in these chapter 11 cases, including the

interests of holders of Allowed General Unsecured Claims.  Under the DIP Order, the Committee

has automatic standing and authority to bring the Term Loan Avoidance Action, which it

initiated by filing an adversary complaint on July 31, 2009.

18.     U.S. Treasury is a lender under the DIP Credit Agreement, along with

EDC.

19.     EDC is Canada's export trading agency, and represents the Government of

Canada and the Government of Ontario.  EDC is a lender under the DIP Credit Agreement, along

with U.S. Treasury.

### THE FACTS

### "The Deal" — Negotiations Prior to the Bankruptcy Case

20.     Paul Weiss Rifkind Wharton & Garrison LLP ("**Paul Weiss**") and

Houlihan, Lokey Financial Advisors, Inc. were retained before the commencement of these cases

- 6 -

by major holders of the Debtors' publicly traded bonds.  These firms negotiated the basic deal with U.S. Treasury that underpins these chapter 11 cases, which is as follows:  The Debtors sold substantially all of their assets to a new company controlled by U.S. Treasury ("**New GM**"). U.S. Treasury in return agreed to have New GM issue 10% of its common stock, and warrants with a value approximating an additional 15% of New GM equity, to the Debtors for distribution to the Debtors' unsecured creditors.

21.     The deal was based on an estimate of the Debtors' unsecured claims at $35 billion.  U.S. Treasury agreed that if unsecured claims increase, in a range from $35 billion to $42 billion, then New GM would issue up to an additional 2% of New GM common stock. Thus, within the $35 billion to $42 billion range, the 10% of New GM common stock was protected from dilution.  However, no additional warrants would be issued by New GM.  Thus, the New GM warrants, which could comprise a significant portion of unsecured creditors' value, would not be protected from dilution if claims range from $35 billion to $42 billion.  If unsecured claims exceed $42 billion, there would be no dilution protection at all.

22.     The deal was based also on U.S. Treasury's commitment to pay, at the closing of the sale, all claims of the Debtors' secured bank lenders—including claims under a $1.5 billion (principal amount) term loan that was, at the time, believed to be fully secured by a non-voidable security interest and various mortgages (the "**Prepetition Term Loan**").

23.     The sale under Section 363 of the Bankruptcy Code was approved by the Court on July 5, 2009 [Docket No. 2968].

**The Term Loan Litigation, DIP Order, Wind-Down Order and DIP Credit Agreement**

24.     In the weeks following the Petition Date, the Committee negotiated the DIP Credit Agreement and the Orders.  Each of these documents was drafted by U.S. Treasury's

- 7 -

counsel, which took or rejected comments from the Committee and other parties in the course of the negotiations.

25.     A key all-hands meeting of counsel to the Debtors, the Committee and U.S. Treasury, plus Paul Weiss, and their respective financial advisors took place on June 19, 2009 (the "**June 19 Negotiating Session**").

26.     Prior to the June 19 Negotiating Session, the Committee had commenced its investigation of liens and security interests securing a prepetition $1.5 billion Prepetition Term Loan from certain of the Debtors' bank lenders (the "**Prepetition Term Lenders**") agented by JPMorgan.  The day before the June 19 Negotiating Session, JPMorgan's counsel called to inform Committee counsel that, prior to the Petition Date, a paralegal for counsel to the Debtors filed a UCC-3 termination statement with respect to the Prepetition Term Loan's security interests without authority.  Subsequent discovery has uncovered facts supporting the Committee's contention that JPMorgan did in fact authorize the paralegal to file the UCC-3 termination statement.  This matter is currently *sub judice* with the Court.

27.     On June 19, 2009, the Committee was particularly focused therefore on a possible challenge to the Prepetition Term Lenders' security interest and recovery of the $1.5 billion in cash slated to be paid, at the closing of the sale, to the Prepetition Term Lenders.  The Committee's agenda for the June 19 Negotiating Session, and discussions thereafter, included preserving the benefit of the Term Loan Avoidance Action for unsecured creditors.

28.     By June 25, 2009, the Debtors, U.S. Treasury, the Prepetition Term Lenders and the Committee had agreed on the terms of the DIP Order, and the Debtors submitted the order to the Court.  The DIP Order, among other things, provides in paragraph 19(d) that the Debtors release the Prepetition Term Lenders on behalf of the Debtors and all parties claiming

- 8 -

through the Debtors (including, for example, U.S. Treasury) with one exception:    The

Committee, and only the Committee, was given both the right and standing to challenge the

Prepetition Term Lenders' liens:

> . . . provided, however, that such release shall not apply to the
> Committee with respect only to the perfection of first priority liens
> of the Prepetition Senior Facilities Secured Parties (it being agreed
> that if the Prepetition Senior Facilities Secured Parties, after
> payment, assert or seek to enforce any right or interest in respect of
> any junior liens, the Committee shall have the right to contest such
> right or interest in such junior lien on any grounds, including
> (without limitation) validity, enforceability, priority, perfection or
> value) (the "**Reserved Claims**").[2]    The Committee shall have
> automatic standing and authority to both investigate the Reserved
> Claims and bring actions based upon the Reserved Claims against
> the Prepetition Senior Facilities Secured Parties not later than July
> 31, 2009 (the **"Challenge Period"**) . . . .

29.    As noted above, U.S. Treasury's counsel drafted the DIP Order.  At the

June 25, 2009 hearing, U.S. Treasury asked the Court to enter the order.

30.    On June 29, 2009, the Debtors filed their Motion Pursuant to Bankruptcy

Code Sections 105(a), 361, 362, 363, 364 and 507 and Bankruptcy Rules 2002, 4001 and 6004 to

Amend DIP Credit Facility (the "**Motion for Wind-Down Order**") [Docket No. 2755], which

sought approval of an amendment to the DIP Order to finalize the terms of the financing for the

wind-down of the Debtors' estates following the sale.  This motion highlighted for the Court the

primary terms of the DIP Credit Agreement and specifically provided that the term "Collateral"

excludes "avoidance actions arising under chapter 5 of the Bankruptcy Code and applicable state

law against the Prepetition Senior Facilities Secured Parties (as defined in the DIP Facility)."  In

addition, the Motion for Wind-Down Order provides that the "obligations under the Wind-Down

---

2    The term "Reserved Claims" shall have the meaning ascribed thereto in paragraph 19(d) of
the DIP Order.

Facility will be non-recourse to the Borrower or the Guarantors, and recourse would only be to the Collateral."

31.     By July 2, 2009, after exchanging multiple drafts and comments thereon, the parties agreed on the terms of the DIP Credit Agreement and Wind-Down Order.  The parties, including U.S. Treasury, asked the Court to enter the Wind-Down Order approving the DIP Credit Agreement.  On July 5, 2009, the Court signed and entered the Wind-Down Order approving the DIP Credit Agreement in substantially the form attached as an exhibit thereto.

32.     The DIP Credit Agreement specifically excludes the Term Loan Avoidance Action from U.S. Treasury's collateral by defining "Collateral" as follows:

> [A]ll property and assets of the Loan Parties of every kind or type . . . (including avoidance actions arising under Chapter 5 of the Bankruptcy Code and applicable state law **except avoidance actions against the Prepetition Senior Facilities Secured Parties** (as defined in the Final Order)) . . . .

Also, the DIP Credit Agreement defines the New GM stock and warrants as "New GM Equity Interests" and excludes those assets from U.S. Treasury's lien as "Excluded Collateral."

33.     Not only does the DIP Credit Agreement exclude the Term Loan Avoidance Action from U.S. Treasury's collateral, but the Wind-Down Order does so as well:

> [T]he DIP Liens shall not include security interests in or liens on avoidance actions arising under chapter 5 of the Bankruptcy Code against the Prepetition Senior Facilities Secured Parties (as defined in the DIP Credit facility) or any stock, warrants, options or other equity interests in New CarCo (as defined in the Amended DIP Facility) issued to or held by any Debtor (or any of its subsidiaries) pursuant to the Related Section 363 Transactions including any dividends, payments or other distributions thereon and any proceeds or securities received or receivable upon any disposition or exercise thereof (the "**New GM Equity Interests**").

34.     In addition, the DIP Credit Agreement explicitly provides that U.S. Treasury's $1.175 billion wind-down loan shall be **_non-recourse_**:

> The Loans shall be non-recourse to the Borrower and the Guarantors and recourse only to the Collateral.

35.     The Wind-Down Order also explicitly provides that U.S. Treasury's wind-down loan shall be **_non-recourse_**:

> [T]he Loans (as defined in the Amended DIP Facility) shall be non-recourse to the Borrower and the Guarantors, such that the DIP Lenders' recourse under the DIP Credit Agreement shall be only to the Collateral (as defined in the Amended DIP Facility) securing the DIP Loans. . . .

As noted above, the DIP Credit Agreement's definition of "Collateral," used in both the DIP Credit Agreement and the Wind-Down Order, specifically excludes the Term Loan Avoidance Action from "Collateral."

36.     The foregoing provisions were no accident.  By the end of the June 19 Negotiating Session, all parties in interest—including U.S. Treasury—agreed that U.S. Treasury's **_collateral_** would not include the Term Loan Avoidance Action.  Shortly after the June 19 Negotiating Session, Committee counsel further specifically requested that U.S. Treasury's **_recourse_** under the DIP Credit Agreement be limited to its collateral—specifically **_excluding_** from such recourse the New GM stock, the New GM warrants **_and_** the Term Loan Avoidance Action.  Committee counsel submitted comments amending DIP Credit Agreement § 2.1, limiting recourse to "Collateral", in an attachment to an e-mail dated June 30, 2009, and circulated it to the Debtors, U.S. Treasury, and other parties in interest.  U.S. Treasury's counsel inserted this proposed language into the DIP Credit Agreement, and the language remained in each subsequent draft of the DIP Credit Agreement through and including the execution version.

37.     The Committee negotiated for this language in part because it knew that if it were to succeed in recovering $1.5 billion from the Term Loan Avoidance Action, unsecured claims against the estate would increase by that amount—diluting distributions on each

- 11 -

unsecured claim.  Increasing claims against the estate without also making the proceeds of the litigation available to holders of Allowed General Unsecured Claims would ***reduce*** the holders of Allowed General Unsecured Claims' recovery.  In other words, if the holders of Allowed General Unsecured Claims do not get the proceeds of the Term Loan Avoidance Action, they may be better off discontinuing the litigation.

38.    At the July 2, 2009 hearing on the Debtors' Motion for Wind-Down Order, counsel to the Committee provided the Court with a brief overview of the Committee's discussions with the Debtors and U.S. Treasury regarding the DIP Credit Agreement and Wind-Down Order.  U.S. Treasury did not object to this narrative or the terms of the DIP Credit Agreement and Wind-Down Order.

39.    Indeed, U.S. Treasury's counsel affirmed the Committee's representations and supplemented them by stating:  "I should make clear that the funding facility is on a non-recourse basis, as has been the case throughout these discussions."

40.    Neither at the July 2, 2009 hearing nor in its Motion for Wind-Down Order, did U.S. Treasury disclose or seek the Court's approval of any purported claim, including a superpriority administrative claim, by the DIP Lenders on the proceeds of the Term Loan Avoidance Action, as would have been required by the *Guidelines for Financing Requests* of the Bankruptcy Court of the Southern District of New York (the "**Guidelines**").  The Guidelines require disclosure of so-called "Extraordinary Provisions" that ordinarily will not be approved without substantial cause shown, compelling circumstances and reasonable notice.  With respect to liens and superpriority claims on avoidance actions, the Guidelines state:

> Extraordinary Provisions include the granting of liens on the debtors' claims and causes of action arising under sections 544, 545, 547, 548 and 549 (but not liens on recoveries under section 549 on account of collateral as to which the lender has a postpetition lien), and the proceeds thereof, or

a superpriority administrative claim payable from the proceeds of such claims and causes of action.

41.    Hearing no objection to the Motion for Wind-Down Order, the Court entered the Wind-Down Order, which approved the DIP Credit Agreement in substantially the form attached as an exhibit thereto.  U.S. Treasury subsequently insisted on further amendments, not approved by the Court, but such amendments are not relevant to this Complaint.  U.S. Treasury signed and consummated the DIP Credit Agreement, with the provisions excluding the Term Loan Avoidance Action from both collateral and recourse included in the executed final document, on July 10, 2009.

42.    The DIP Credit Agreement provides that the DIP Lenders' wind-down loan matures on the Maturity Date, which is defined in relevant part as occurring after all claims against the Debtors have been allowed or disallowed, and all expenses of the final administration of the cases have been paid in full.

43.    On July 31, 2009, pursuant to the standing and authority granted to the Committee under paragraph 19(d) of the DIP Order, the Committee timely filed a complaint against the Prepetition Term Lenders seeking to:  (i) avoid the security interest that was subject to the UCC-3 termination statement; (ii) avoid and recover funds from the Prepetition Term Lenders paid on account of such security interest; and (iii) disallow claims held by the Prepetition Term Lenders.  Cross–motions for summary judgment were heard by the Court on December 3, 2010.

44.    For almost a year from the filing of the complaint in the Term Loan Avoidance Action, U.S. Treasury made no attempt to intervene in that lawsuit or assert any interest therein.  Moreover, during that time, U.S. Treasury did not object to any of the Committee's fee applications seeking reimbursement for its work on the litigation.

45.    The initial draft of the Debtors' proposed Plan, which was circulated to the Committee's counsel on July 23, 2010, provided that the Term Loan Avoidance Action would be prosecuted for the sole benefit of unsecured creditors.[3]    Specifically, the initial draft of the proposed Plan provided that the distribution to unsecured creditors included the proceeds of the Term Loan Avoidance Action.

46.    On July 22, 2010, U.S. Treasury's counsel called Committee counsel and for the first time asserted that U.S. Treasury had an interest in the Term Loan Avoidance Action. On July 26, 2010, August 16, 2010, and August 18, 2010, Committee counsel participated in conference calls with U.S. Treasury's counsel regarding, among other things, the status of the Term Loan Avoidance Action.    By no later than August 19, 2010, counsel to the Debtors informed counsel to the Committee that per U.S. Treasury's request, the proposed Plan would provide that the beneficiary of the Term Loan Avoidance Action would be determined at a later date.

47.    On August 26, 2010, more than a full year after the Committee initiated the Term Loan Avoidance Action, U.S. Treasury filed a Statement of the United States of America with Respect to Cross–Motions for Summary Judgment ("**Statement**") [Docket No. 6805] requesting that any resolution of the cross-motions for summary judgment not determine any person or entity's entitlements with respect to the ultimate distribution of any funds recovered from the Term Loan Avoidance Action.

**The Plan**

48.    On August 31, 2010, the Debtors filed their proposed Plan, which provided that the Term Loan Avoidance Action would be included in the proposed Avoidance

---

[3]    The Plan provides that the Term Loan Avoidance Action may continue to be prosecuted post-confirmation.

- 14 -

Action Trust as an Avoidance Action Trust Asset. The proposed Plan provided further that interests in the Avoidance Action Trust would be distributed to unsecured creditors or the DIP Lenders as the Court may decide or as the Committee and U.S. Treasury may agree.

49.    In response to the proposed Plan, on October 4, 2010, the Committee submitted a Motion (the "**Motion to Enforce**") to enforce the Orders and DIP Credit Agreement. The Motion to Enforce sought a ruling that the DIP Lenders have no interest in either the Term Loan Avoidance Action or any proceeds thereof, and that any interests in the Avoidance Action Trust shall be distributed exclusively to the holders of Allowed General Unsecured Claims.

50.    On October 21, 2010, in a bench decision, the Court denied the Motion to Enforce without prejudice on the ground of ripeness. However, the facts have changed since then. In its response to the Motion to Enforce, U.S. Treasury argued that it had retained its administrative expense claim under the DIP Order and therefore no plan could be confirmed without payment of its administrative expense claim. The Committee argued that U.S. Treasury's threat to block confirmation was based on an amendment to the DIP Credit Agreement made in violation of the Wind-Down Order. In dismissing without prejudice the Committee's Motion to Enforce as not ripe for decision, the Court found that U.S. Treasury had not yet violated the Court's orders, and that whether U.S. Treasury had waived its administrative expense claim was not yet an issue.

51.    In other words, as of October 21, 2010, the Committee and U.S. Treasury were essentially disputing ownership of an Avoidance Action Trust that might never be established because of the possibility that U.S. Treasury might block the Plan. Confirmation of the Plan has removed this obstacle to ripeness.

52.     On March 29, 2011, the Court entered the Confirmation Order.  Paragraph 25 of the Confirmation Order provides that the DIP Credit Agreement Claims shall remain outstanding until the beneficiaries of the Term Loan Avoidance Action are determined.  It states in relevant part:

> . . . the DIP Credit Agreement Claims shall remain outstanding until such time as the Term Loan Avoidance Action Beneficiaries are determined either by (x) mutual agreement between the U.S. Treasury and the Creditors' Committee or (y) Final Order.  Neither the entry of this Confirmation Order nor any provision hereof shall prejudice or enhance the competing arguments of the DIP Lenders or of the Creditors' Committee with respect to the entitlement of the DIP Lenders or the holders of General Unsecured Claims to the Term Loan Avoidance Action, the proceeds thereof, or the interests in the Avoidance Action Trust.  Notwithstanding any provisions of the Plan or the GUC Trust Agreement, the DIP Credit Agreement Claims shall not be payable out of the New GM Securities or any proceeds, dividends, or distributions received on account thereof.

53.     The Plan provides for the establishment of the Avoidance Action Trust, which shall include the Term Loan Avoidance Action.  (Plan §§ 1.19, 1.23, 6.5(a) & (c)).  The Term Loan Avoidance Action will be transferred to the Avoidance Action Trust on the Avoidance Action Trust Transfer Date, which shall be on or before December 15, 2011.  (*Id.* §§ 1.23, 1.26).

54.     Prior to the transfer, "the Term Loan Avoidance Action shall be prosecuted, resolved, and administered by the Creditors' Committee."  (*Id.* § 6.5(f)).  After the transfer, the Administrator shall "have the power and authority to prosecute and resolve (in consultation with the U.S. Treasury so long as the holders of the DIP Credit Agreement Claims continue to be a Term Loan Avoidance Action Beneficiary), in the name of the Debtors and/or the names of the Avoidance Action Trust Administrator, the Term Loan Avoidance Action".  (*Id.*).  The Administrator shall act in the best interests of the beneficiaries of the Avoidance

Action Trust. (*Id.*). In addition, the Administrator shall obtain the approval of the Monitor with respect to settlements of the Avoidance Action Trust Assets, and the Monitor shall act in the best interests of the beneficiaries of the Avoidance Action Trust. (*Id.* § 6.5(g)).

55. The Court must decide the beneficiaries of the Avoidance Action Trust so that the Committee, Administrator and Monitor know for whom they are working. The Court currently has *sub judice* cross-motions for summary judgment on the Term Loan Avoidance Action itself. When the Court decides, either the Committee (if the Court decides prior to the Avoidance Action Trust Transfer Date) or the Administrator and Monitor (if the Court decides on or after that date) will need to decide whether to make settlement offers to avoid an appeal if plaintiff wins, or whether to take an appeal if plaintiff loses (and to respond to any settlement offers that may be received). Neither the Committee nor the Administrator and Monitor can effectively make these decisions without first knowing the identity of the beneficiaries because an assessment of the risk of continuing to prosecute the Term Loan Avoidance Action, and the economics of settlement, vary significantly depending on whether the unsecured creditors or the DIP Lenders will get any judgment or settlement proceeds.

56. In addition, section 6.5(n) of the Plan governs the U.S. federal income tax treatment of the Avoidance Action Trust. Section 6.5(n)(i) states:

> For all U.S. federal and applicable state and local income tax purposes, all parties (including, without limitation, the Debtors, the Avoidance Action Trust Administrator, the holders of the DIP Credit Agreement Claims, and the holders of Allowed General Unsecured Claims) shall treat the transfer of the Avoidance Action Trust Assets to the Avoidance Action Trust in a manner consistent with the remainder of this Section 6.5(n)(i).

57. Section 6.5(n)(i)(1) states:

> If no remaining assets of MLC are transferred to the Avoidance Action Trust upon the dissolution of MLC, and the Term Loan Avoidance Action Beneficiaries have not been identified on or

prior to the Avoidance Action Trust Transfer Date either by (x) mutual agreement between the U.S. Treasury and the Creditors' Committee or (y) Final Order, then the Avoidance Action Trust Administrator shall treat the Avoidance Action Trust for U.S. federal income tax purposes as either (A) a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (including, if required, timely so electing) or (B) if permitted under applicable law and at the option of the Avoidance Action Trust Administrator, a "complex trust."

58.    Section 6.5(n)(i)(2) provides that, "[i]f any remaining assets of MLC are transferred to the Avoidance Action Trust upon the dissolution of MLC or the Term Loan Avoidance Action Beneficiaries have been identified on or prior to the Avoidance Action Trust Transfer Date, or otherwise upon identification of the Term Loan Avoidance Action Beneficiaries after the Avoidance Action Trust Transfer Date," then the Avoidance Action Trust Assets will be treated in a manner such that the "beneficiaries of the Avoidance Action Trust receiving beneficial interests in the Avoidance Action Trust shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the Avoidance Action Trust Assets (other than any Avoidance Action Trust Assets allocable to the Avoidance Action Trust Claims Reserve)."

59.    Accordingly, if the Term Loan Avoidance Action Beneficiaries are identified on or prior to the Avoidance Action Trust Transfer Date, the Avoidance Action Trust (other than the Avoidance Action Trust Claims Reserve) can be treated for tax purposes as a liquidating trust that is a grantor trust.  In that instance, the Term Loan Avoidance Action Beneficiaries (i.e., either the creditors holding Allowed General Unsecured Claims or the DIP Lenders) would receive an allocable interest or unit in the Avoidance Action Trust as recognition of their ownership of the Avoidance Action Trust Assets and would be treated as receiving such interest in the Avoidance Action Trust in satisfaction of their Claims against the Debtors.  The Avoidance Action Trust Assets would be valued as of the date the Avoidance Action Trust

Assets are transferred to the Avoidance Action Trust (i.e., on or before December 15, 2011).  If the Avoidance Action Trust ever recovers proceeds from the Term Loan Avoidance Action, such proceeds would pass through the Avoidance Action Trust and be taxed only at the unit holder level (i.e., beneficiary level) for any dollar amount over the value of the Avoidance Action Trust Assets on the date such assets were transferred to the Avoidance Action Trust.  The Avoidance Action Trust itself would not be subject to federal income tax.

60.    Alternatively, if the Term Loan Avoidance Action Beneficiaries are not identified on or prior to the Avoidance Action Trust Transfer Date, then when the Avoidance Action Trust Assets are transferred to the Avoidance Action Trust, there will be no beneficiaries to which to attribute the value of such assets.  For federal income tax purposes, the Avoidance Action Trust would be treated then as a disputed ownership fund—unless the Administrator elects to treat the Avoidance Action Trust as a complex trust (which is unlikely, given the significant uncertainty surrounding the treatment of a complex trust in this context).  As a result, in addition to the tax imposed on the Term Loan Avoidance Action Beneficiaries when they receive distributions from the Avoidance Action Trust, the Avoidance Action Trust itself would be subject to federal income tax.  The additional tax paid by the Avoidance Action Trust would be based on the appreciation in value of the Avoidance Action Trust Assets from the date such assets were transferred to the trust to the date the beneficiaries of the trust are determined. This unnecessary, extra tax at the trust level would be avoided if the beneficial ownership issue were resolved prior to the Avoidance Action Trust Transfer Date.

## FIRST CLAIM FOR RELIEF

### (For a Declaratory Judgment)

61.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs of this Complaint with the same force and effect as though set forth herein.

62.    Plaintiff brings this claim for relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.  Plaintiff seeks a declaration that the holders of Allowed General Unsecured Claims have the sole right to receive any and all proceeds of the Term Loan Avoidance Action, and are the sole beneficiaries of the Avoidance Action Trust.  Moreover, Plaintiff seeks a declaration that the DIP Lenders are not entitled to any proceeds of the Term Loan Avoidance Action and have no interests in the Avoidance Action Trust.

63.    Plaintiff seeks such a declaration because it will relieve the holders of Allowed General Unsecured Claims from being forced to unnecessarily pay additional taxes in the event that proceeds are realized from the Term Loan Avoidance Action and they are deemed beneficiaries of the Avoidance Action Trust.  In addition, such a declaration would assist the parties, Administrator and Monitor in formulating settlement positions and developing settlement strategy with respect to the Term Loan Avoidance Action; usefully settle the rights of the parties to the proceeds of the Term Loan Avoidance Action; and avoid additional litigation.

64.    Plaintiff is entitled to the requested declaratory relief because the Orders and the DIP Credit Agreement provide that the DIP Lenders have no interest in or claim to the proceeds of the Term Loan Avoidance Action, and the holders of Allowed General Unsecured Claims have the sole right to any such proceeds.  In particular, the DIP Credit Agreement and the Orders expressly:  (a) release any and all claims the DIP Lenders may have had against the Prepetition Term Lenders; (b) exclude the Term Loan Avoidance Action from the DIP Lenders' Collateral; (c) limit the DIP Lenders' recourse on the DIP Credit Agreement Claims solely to the DIP Lenders' Collateral; and (d) provide that the Committee, and only the Committee, has the right to challenge the Prepetition Term Lenders' liens.

65.    Accordingly, an actual, justiciable controversy exists between Plaintiff and Defendants relating to the proceeds of the Term Loan Avoidance Action and the ownership of beneficial interests in the Avoidance Action Trust.  This Court has the power to adjudicate the rights of the parties with respect to this controversy and should grant the declaratory relief requested in this Complaint.

## SECOND CLAIM FOR RELIEF

### (For a Declaratory Judgment)

66.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs of this Complaint with the same force and effect as though set forth herein.

67.    Plaintiff brings this claim for relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.  Plaintiff seeks a declaration that the holders of Allowed General Unsecured Claims have the sole right to receive any and all proceeds of the Term Loan Avoidance Action, and are the sole beneficiaries of the Avoidance Action Trust.  Moreover, Plaintiff seeks a declaration that the DIP Lenders are not entitled to any proceeds of the Term Loan Avoidance Action and have no interests in the Avoidance Action Trust.

68.    Plaintiff seeks such a declaration because it will relieve the holders of Allowed General Unsecured Claims from being forced to unnecessarily pay additional taxes in the event that proceeds are realized from the Term Loan Avoidance Action and they are deemed beneficiaries of the Avoidance Action Trust.  In addition, such a declaration would assist the parties, Administrator and Monitor in formulating settlement positions and developing settlement strategy with respect to the Term Loan Avoidance Action; usefully settle the rights of the parties to the proceeds of the Term Loan Avoidance Action; and avoid additional litigation.

69.    Plaintiff is entitled to the requested declaratory relief because the DIP Lenders have waived any purported claim to payment of the DIP Credit Agreement Claims from

proceeds of the Term Loan Avoidance Action.  The DIP Lenders waived any such purported claim by failing to disclose and obtain the Court's approval of any such purported claim as required by the <u>Guidelines for Financing Requests</u> of the Bankruptcy Court of the Southern District of New York.

70.    Accordingly, an actual, justiciable controversy exists between Plaintiff and Defendants relating to the proceeds of the Term Loan Avoidance Action and the ownership of beneficial interests in the Avoidance Action Trust.  This Court has the power to adjudicate the rights of the parties with respect to this controversy and should grant the declaratory relief requested in this Complaint.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in Plaintiff's favor declaring that:

(1)    The holders of Allowed General Unsecured Claims are exclusively entitled to, and shall have the exclusive right to receive, any and all proceeds of the Term Loan Avoidance Action, and the holders of Allowed General Unsecured Claims are the exclusive beneficiaries of, and exclusive owners of any and all interests in, the Avoidance Action Trust;

(2)    The DIP Lenders are not entitled to, and shall not receive, any proceeds of the Term Loan Avoidance Action, and the DIP Lenders are not beneficiaries of, and have no interests in, the Avoidance Action Trust;

(3)    Prior to the Avoidance Action Trust Transfer Date, the Term Loan Avoidance Action shall be prosecuted, resolved, and administered solely by the Committee, as provided in § 6.5(f) of the Plan;

(4)    On and after the Avoidance Action Trust Transfer Date, the Term Loan Avoidance Action shall be prosecuted, resolved, and administered by the Avoidance

Action Trust Administrator, as provided in § 6.5(f) of the Plan, for the exclusive benefit of the

holders of Allowed General Unsecured Claims, which are the sole beneficiaries of the Avoidance

Action Trust;

        (5)     The Avoidance Action Trust is a liquidating trust for U.S. federal

income tax purposes, and the Avoidance Action Trust Assets shall be treated in a manner

consistent with § 6.5(n)(i)(2) of the Plan; and

        (6)     Plaintiff is entitled to any and all other relief that the Court deems

just and proper.

Dated: New York, New York
     June 7, 2011

Respectfully submitted,

KRAMER LEVIN NAFTALIS & FRANKEL LLP

By: _/s/ Robert T. Schmidt_____
    Thomas Moers Mayer, Esq.
    Robert T. Schmidt, Esq.
    Lauren M. Macksoud, Esq.
    Craig L. Siegel, Esq.
    1177 Avenue of the Americas
    New York, NY 10036
    Telephone:  (212) 715-9100
    Facsimile:  (212) 715-8000

*Attorneys for the Official Committee of Unsecured*
*Creditors of Motors Liquidation Company*