UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| MOTORS LIQUIDATION COMPANY, | ) | |
| f/k/a General Motors Corp., *et al.*, | ) | Case No. 09-50026 (REG) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| ——————————————————— | ) | |
| | ) | |
| OFFICIAL COMMITTEE OF UNSECURED | ) | |
| CREDITORS OF MOTORS LIQUIDATION | ) | |
| COMPANY, *et al.*, | ) | |
| Plaintiff, | ) | |
| v. | ) | Adversary Proceeding |
| | ) | |
| UNITED STATES DEPARTMENT OF THE | ) | Case No. 11-09406 (REG) |
| TREASURY and EXPORT DEVELOPMENT | ) | |
| CANADA, | ) | |
| Defendants. | ) | |
| ——————————————————— | ) | |

BENCH DECISION[1] ON MOTIONS TO DISMISS
AND FOR SUMMARY JUDGMENT RE
DISPUTES AS TO OWNERSHIP OF TERM LOAN
AVOIDANCE ACTION PROCEEDS

APPEARANCES:

KRAMER LEVIN NAFTALIS & FRANKEL LLP
*Counsel for the Official Committee of Unsecured Creditors*
1177 Avenue of the Americas
New York, New York 10036
By:    Thomas Moers Mayer, Esq. (argued)
       Robert T. Schmidt, Esq.
       Lauren M. Macksoud, Esq.
       Craig L. Siegel, Esq.

---

[1]    I use "bench" decisions to lay out in writing decisions that are too long, or too important, to dictate in open court, but where the circumstances do not permit more leisurely drafting. They typically have a more conversational tone.

PREET BHARARA
United States Attorney for the Southern District of New York
*Counsel for the United States Department of the Treasury*
86 Chambers Street
New York, New York 10007
By:     David S. Jones, Esq. (argued)

VEDDER PRICE
*Counsel for Export Development Canada*
1633 Broadway, 47th Floor
New York, New York 10019
By:     Michael J. Edelman, Esq. (argued)
        Michael L. Schein, Esq.

ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE:

In this adversary proceeding under the umbrella of the chapter 11 case of Debtor

Motors Liquidation Co. (formerly known as General Motors Corporation ("**Old GM**")),

the plaintiff Creditors' Committee seeks a declaratory judgment providing, in substance,

that the defendant DIP lenders in this case—the U.S. Treasury ("**Treasury**") and Export

Development Canada ("**EDC**," and collectively, the "**DIP Lenders**")—have no right to

any proceeds that may result from a very major avoidance action (the "**Term Loan**

**Action**") that the Creditors' Committee brought on behalf of the Old GM estate.[2]

The Creditors' Committee asks me to construe an order entered about five weeks

into this chapter 11 case when Treasury and EDC provided postpetition DIP financing to

carry Old GM through its wind-down, following similar orders under which Treasury and

EDC had provided the financing to carry Old GM through its section 363 sale.[3]  Under

each of those orders, to secure the DIP Lenders' rights to repayment of the DIP financing

they provided, Treasury and EDC were granted (1) postpetition liens (under sections

364(c)(2) and (3) of the Code)[4] and, in addition, (2) an allowed superpriority

---

[2]     As described at greater length below, the Term Loan Action is a separate adversary proceeding
        also pending before me.  It relates to a $1.5 billion term loan which was originally secured, but
        which may or may not have lost its secured status shortly before the filing of Old GM's chapter 11
        case.  Cross-motions for summary judgment are *sub judice* in the Term Loan Action.  In this
        decision, I don't need to, nor do I, express any views as to the merits of any of the parties'
        positions in the Term Loan Action.

[3]     For background, see my earlier decision in *In re General Motors Corp.*, 407 B.R. 463 (Bankr.
        S.D.N.Y. 2009) (the "*363 Sale Decision*"), *stay pending appeal denied*, 2009 WL 2033079
        (S.D.N.Y. 2009) (Kaplan, J.), *appeal dismissed and aff'd*, 428 B.R. 43 (S.D.N.Y. 2010)
        (Buchwald, J.) and 430 B.R. 65 (S.D.N.Y. 2010) (Sweet, J.), *appeal dismissed*, No. 10-4882-bk
        (2d Cir. Jul. 28, 2011), familiarity with which is assumed.

[4]     They provide, in relevant part:

                If the trustee is unable to obtain unsecured credit allowable
                under section 503(b)(1) of this title as an administrative
                expense, the court . . . may authorize the obtaining of credit or
                the incurring of debt—

administrative expense ("**SuperPri**")[5] (under section 364(c)(1) of the Code)[6] for any amounts not otherwise paid back, subject to some carve-outs described below. Without more, provisions of that character would entitle Treasury and EDC to lay claim to the entirety of Old GM's assets.

But later documents, executed in connection with a $1.175 billion wind-down DIP loan made by Treasury and EDC, further provided that the DIP Lenders' collateral would not include certain of Old GM's avoidance actions, including the Term Loan Action—and that, in addition, the DIP loan would be "*non-recourse* to the Borrower [Old GM]" and the loan's guarantors, "such that the DIP Lenders' recourse under the Amended DIP Facility shall be only to the Collateral . . . securing the DIP Loans."

The tension between the provisions in the two preceding paragraphs gives rise to this controversy. Both sides agree that the DIP Lenders don't have a *lien* on proceeds of the Term Loan Action. But they differ with respect to the SuperPri. The Creditors' Committee contends, in substance, that the "nonrecourse" language trumps the earlier

---

   . . .

     (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or

     (3) secured by a junior lien on property of the estate that is subject to a lien.

[5]    A SuperPri, the colloquial shorthand for a "superpriority" administrative expense, is a special kind of administrative expense, authorized under section 364(c)(1) of the Code, under which the bankruptcy court can authorize incurrence of postpetition debt with repayment obligations to have priority over other administrative expenses authorized under sections 503(b) or 507(b) of the Code.

[6]    It provides, in relevant part:

     If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—

     (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title . . . .

grant of the SuperPri, and that it was the parties' intent that the DIP Lenders not be able to reach avoidance action proceeds in any way.

The DIP Lenders dispute that—contending that the liens and SuperPri were two separate entitlements, and that there was nothing in the documents depriving them of the normal rights they'd have upon the authorization for the SuperPri. They further argue that the parties knew what it took to deprive them of SuperPri rights; that the parties did so in other respects; and that they didn't do so here.

Treasury (joined by EDC) moves, pursuant to Rule 12(b)(1), to dismiss, contending that the controversy isn't yet justiciable. Then, on the assumption that the DIP Lenders' 12(b)(1) motion isn't dispositive, each side moves for summary judgment in its favor.

For reasons that follow, the DIP Lenders' 12(b)(1) motion presents no difficult issues, and is denied. A real controversy now exists; there's good reason why it must be decided now; and it's sufficiently ripe for decision.

But the issues on summary judgment are closer. And while Treasury and EDC make respectable points, I necessarily must conclude that the later nonrecourse language limits the rights that would otherwise exist under the SuperPri. Thus judgment must be entered in favor of the Creditors' Committee.

The bases for this determination follow.

## Facts

This adversary proceeding seeks a declaration as to the rights to any proceeds in the Term Loan Action, a separate adversary proceeding filed on July 31, 2009. But the two sides' rights to the fruits, if any, of the Term Loan Action turn on documents relating

3

to Old GM's postpetition financing[7]—financing agreements, orders I signed, and motions

to secure entry of those orders—in Old GM's umbrella chapter 11 case.

As described more fully in the *363 Sale Decision*, Old GM and certain affiliates

commenced chapter 11 cases on June 1, 2009.  In the five weeks thereafter, I signed three

DIP financing orders bearing on this controversy:

(1)  An "Interim" DIP Financing Order, entered on June 2, 2009

(the "**Interim DIP Order**");[8]

(2) A "Final" DIP Financing Order, entered on June 25, 2009 (the

"**Final DIP Order**");[9] and

(3) A modified final DIP financing order, revised to address

financing needs during the post-363 sale "wind-down" of Old GM's

chapter 11 case, entered on July 5, 2009 (the "**Wind-Down Financing

Order**").[10]

---

[7]    There were as many as four relevant documents at each financing phase: a motion, an underlying loan agreement, a proposed order, and an order as ultimately entered.  Rights ultimately arose under the loan agreements and (especially) the orders, though the motions seeking entry of each order, along with comments made in court at hearings before me, are important in ascertaining the parties' intent.

[8]    ECF #292.  I've chosen not to refer to motions, orders, and other court documents with the very verbose names that are so common in the bankruptcy community, and instead have referred to them with names just long enough to describe what they were.

[9]    ECF #2529.

[10]    ECF #2969.  From time to time in this decision, to help those who don't regularly deal with these matters, I state the facts less antiseptically than I otherwise might, to put events in context, and I note how financing orders work, the extent to which steps were taken in accordance with customary practices in dealing with financing motions, and why orders I signed provided as they did.  But those comments are for the benefit of reader understanding only.  On these cross-motions for summary judgment, I rely solely on undisputed facts and proceedings before me in the Old GM chapter 11 case, and don't rely on my experience in this area, except as expressly noted.

4

*1. The Interim DIP Order and Related Documents*

On June 1, 2009, as one of its "first-day" motions, Old GM moved for approval of its DIP financing—for an ultimate $33.3 billion, with $15 billion of the $33.3 billion to be borrowed on an emergency, interim, basis.[11]  As is customary, I considered that motion (the "**DIP Financing Motion**") on the first day of the case, June 1, announcing my rulings on that day, with an order implementing those rulings, to be entered the following morning.  On the first and second days of the case, the Creditors' Committee hadn't been appointed yet, and thus could not be heard as to any concerns unsecured creditors might have with respect to the DIP financing, or any terms that might be put into place for the DIP Lenders' benefit.  Also as is customary, I wanted the Interim DIP Order to include only such provisions as would be appropriate to protect the DIP Lenders' legitimate need to protect their ability to be repaid for what they advanced on an interim basis.  The remainder of the request would be heard at a later hearing.[12]

Thus on June 2, I signed the Interim DIP Order, approving borrowing of up to $15 billion.  To protect the DIP Lenders' ability to be repaid, I authorized (again as requested) *each* of postpetition liens, under sections 364(c)(2) and 364(c)(3) of the Code, and a SuperPri, under section 364(c)(1) of the Code.

When grants of a lien or a SuperPri are sought, "best practices" (and in certain respects, S.D.N.Y. Local Court Rules)[13] call for the debtor and the DIP lender to make clear the extent to which either or both are subordinate to other things—most commonly,

---

[11]    *See* Old GM's motion for approval of DIP financing (ECF #64).

[12]    By custom in the bankruptcy community, and under the Bankruptcy Rules, *see* FED. R. BANKR. P. 4001(c), the later hearing is referred to as a "final" hearing, though financing approved at a final hearing can thereafter be modified and approved by one or more subsequent orders, as was done in the Wind-Down Financing Order here.

[13]    *See* S.D.N.Y. Bankruptcy Court Local Rule 4001-2(a)(5).

professional fees (up to a specified amount), "burial expenses"[14] (also up to a specified

amount), and fees payable to the Office of the United States Trustee. They're

collectively referred to in the bankruptcy community as the "Carve-Out." A draft of the

Interim DIP Order that was attached to the DIP Financing Motion[15] and presented to me

for consideration provided for such a Carve-Out, though the items covered under the

Carve-Out thereafter changed slightly, in respects not material here, when the Interim

DIP Order was entered. Thus, the Interim DIP Order unequivocally provided for each of

the DIP Lenders' liens and SuperPri to be subordinate to the Carve-Out.

But in a different respect there was a change in the form of the Interim DIP Order

between the time it was put before me for consideration and the time that I signed it. In

the DIP Financing Motion's summary of the key terms of the proposed DIP financing,

the motion expressly addressed the SuperPri and rights with respect to avoidance actions.

The motion stated, with respect to the SuperPri:

> Superpriority Claims: The DIP Lenders are granted
> an allowed super-priority administrative expense
> claim, which (A) shall have priority over any and all
> other administrative expense claims and unsecured
> claims, (B) shall at all times be senior to the rights
> of each Debtor or its estate, to the extent permitted
> by law; and (C) shall be subject and subordinate
> only to the Carve-Out (defined below).[16]

And it stated with respect to the avoidance actions:

> The DIP Lenders' (a) *administrative expense claim*,
> (b) *DIP Liens*, and (c) adequate protection liens,
> *may be payable from or have recourse to* the

---

[14]    "Burial expenses" are the fees of a chapter 7 trustee in the event the chapter 11 case is converted
to chapter 7.

[15]    *See* DIP Financing Motion Exh. B.

[16]    Interim DIP Motion at 4, ¶ (n) (citing "Interim DIP Order at ¶ 5; DIP Facility [*i.e.*, DIP Financing
Credit Agreement] preamble pg 1, section 3.24.").

> proceeds of avoidance actions arising under chapter
> 5 of the Bankruptcy Code or applicable state law.[17]

But the proposed Interim DIP Order, before I later changed it, did not use identical words. The proposed order provided, with respect to the *lien* the DIP Lenders would receive to secure their postpetition advances, that they'd get a security interest in:

> all property of the estates of each of the Debtors
> within the meaning of section 541 of the
> Bankruptcy Code (*including avoidance actions
> arising under chapter 5 of the Bankruptcy Code and
> applicable state law*).[18]

But the proposed order did not have a similar statement with respect to the SuperPri. In fact, the proposed Interim DIP Order made no mention of the extent to which the SuperPri would be able to reach avoidance actions at all.

The underlying loan agreement—attached as an Exhibit A to the DIP Financing Motion and there described as the "Draft DIP Facility," but referred to here with the more descriptive "**Draft DIP Borrowing Agreement**"—provided, in its Section 2.11, captioned "Superpriority Nature of Obligations and Lenders' Liens," that "[t]he priority of Lenders' Liens on the Collateral owned by the Loan Parties shall be set forth in the Interim Order and the Final Order entered with respect to the Cases."[19] In its recitals, the Draft DIP Borrowing Agreement expressly described an intent to have the DIP Lenders'

---

[17]    Interim DIP Motion at 6, ¶ (x) (emphasis added).

[18]    Proposed Interim DIP Order at 2-3, Introduction Subparagraph (iv) (emphasis added).

[19]    It should be noted that while the caption referred to the "Superpriority Nature" of both the "Obligations" and the liens, the text that followed discussed only the liens.

*liens* extend to avoidance actions,[20] but did not do likewise, at least expressly, with respect to their rights under the *SuperPri*.[21]

Before that, in its Section 2.1 (captioned "Commitments"), the Draft DIP Borrowing Agreement provided for the DIP Lenders' commitment to make loans in a supplemental tranche:

> (b)  to make *non-recourse* term loans (each a "Tranche C Term Loan") . . . in an aggregate amount not exceeding the lesser of (x) the Wind-Down Amount and (y) the then unused amount of the Commitments, provided that, the aggregate amount of available Commitments to be borrowed from each Lender shall be reduced by reserves for an amount equal to such Lender's Aggregate Exposure Percentage of the Carve-Out.[22]

There then were several relevant events at the June 1 hearing on Old GM's first day motions, not mentioned in either side's papers here, but as to which I can take judicial notice.  The United States Trustee for this Region at the time, appearing at the first-day motions hearing, advised that pre-hearing negotiations had resolved issues as to the DIP financing she might otherwise have raised.  She described her agreement with Treasury, reached with a partner of the New York City law firm assisting Treasury, that burial expenses would be added to the Carve-Out, and more relevant here, that there would be no lien on avoidance actions.[23]  She expressly noted that at least until the final

---

[20]    *See* Draft DIP Borrowing Agreement at 1-2, subparagraph (c).

[21]    *See id.* at 1, subparagraph (b).  It did, however, say at the end of the recital expressing the intent to provide the SuperPri grant, "subject only to the Carve-Out."

[22]    Draft DIP Borrowing Agreement Section 2.1 (underlining in original; emphasis by italics added).

[23]    As the colloquy went:

> MS. ADAMS [United States Trustee]:  After speaking briefly with Mr. Rapisardi [a lawyer at the Cadwalader firm, outside counsel to Treasury], I think we have come to an agreement on all of issues, and the order just has to be modified.

hearing on the DIP Financing, the DIP Lenders' liens would not extend to avoidance actions. But none of the United States Trustee, counsel for Treasury, nor counsel for Old GM expressly discussed whether that change would also cover the SuperPri.

When the Interim DIP Order was entered the next day, June 2, the Interim DIP Order was modified to take out language in two parentheticals that had appeared in lead-in text to Recital "(iv)" of the draft of the Interim DIP Order, quoted at page 7 above—which in each case had confirmed an intent to grant liens on avoidance actions.[24] However, the underlying DIP Facility (which had a similar parenthetical) was unchanged, as were the granting paragraphs for the SuperPri and the liens, at paragraphs 5 and 6 of the Interim DIP Order, respectively. After these changes, in the Interim DIP Order as ultimately entered, the words "avoidance actions" nowhere appeared.

### 2. The Final DIP Order and Related Documents

DIP Financing was next considered on Thursday, June 25, by which time the Creditors' Committee had been appointed. I was asked to, and did, then consider and approve the DIP Financing in the full $33 billion amount.

---

> THE COURT: Okay. Are they of a level that would hit my radar screen, or do you want to talk about them, or are they just the wordsmithing that careful lawyers do?
>
> MS. ADAMS: Your Honor, one would be expenses for—in case a trustee were ever appointed, there'll be a carve-out—
>
>  . . .
>
> And the no lien on the avoidance actions under Chapter 5, pending the final order.

Tr. of Hrg. on Jun. 1, 2009 at 110-111. Treasury then confirmed "that that agreement is in place as described." *Id.* at 111.

[24]   In each case, it took out: "(including avoidance actions arising under chapter 5 of the Bankruptcy Code and applicable state law)".

At the hearing, an attorney for the Creditors' Committee announced some changes

in the Final DIP Order as originally proposed, including changes that:

> [I]n paragraphs 5 and 6 of the DIP order that
> administrative and priority claims are now senior in
> right of payment . . . to the DIP and that the DIP is
> non-recourse to the New GM stock and warrants[,]
> because this is, as we believe, intended for
> distribution to unsecured creditors.[25]

She further announced that the parties were still negotiating the Wind-Down budget.

Consistent with the Creditors' Committee's comments, the Final DIP Order as

signed reaffirmed the super-priority administrative claim of the DIP Lenders, but subject

to each of the Carve-Out and administrative expenses up to a $950,000 cap,

corresponding to the amount allocated at the time for the Wind-Down.  The Final DIP

Order, after granting a SuperPri, had a proviso:

> provided, however, that subsequent to the closing of
> the Related Section 363 Transactions, claims against
> the Debtors' estates that have priority over section
> 503(b) or 507(a) of the Bankruptcy Code . . . shall
> have priority over the remaining obligations owing
> to the DIP Lenders under the DIP Credit facility (up
> to the aggregate amount of $950,000,000 . . .).  The
> Super-priority Claim shall be subject and
> subordinate only to the Carve-Out and the claims set
> forth in the preceding proviso.[26]

The Final DIP Order once more described the underlying motion for approval of

the DIP financing as having sought liens on all property "*including all avoidance*

*actions*,"[27] but *with an exception*: "avoidance actions against the Prepetition Senior

---

[25]    Tr. of Hrg. on Jun. 25, 2009 at 25 (transcription errors corrected).

[26]    Final DIP Order at 14-15, ¶ 5 (underlining in original).

[27]    *Id.* at 3, Introduction Subparagraph (iv) (emphasis added).  Actually, while it was amended in a
respect not material here (see ECF #1444), the motion seeking entry of the Final DIP Order had
never changed in this respect; only the description of that motion did.

Facilities Secured Parties (as defined below)".[28]  The Final DIP Order also described the

underlying motion as having provided for exceptions to the grant of liens to include

equity securities of New GM ("**New GM Equity Interests**") issued to the Debtor

pursuant to the then-contemplated 363 sale.[29]  The grant of liens, as authorized in Final

DIP Order ¶ 6, conformed to that Introduction Subparagraph (iv), incorporating the

priorities that there had been stated,[30] and including the same express proviso that:

> [N]othing in this Final Order, the Interim Order or
> the DIP Credit Facility shall in any way be
> construed to permit or authorize the DIP Lenders to
> seek recourse against the New GM Equity Interests
> at any time.[31]

The Final DIP Order additionally provided for the payment of Old GM's

prepetition secured debt with proceeds from the DIP financing, subject to recapture, if

necessary, if it later turned out that any of the prepetition secured lenders did not in fact

have duly perfected and existing liens.[32]  The Final DIP Order further gave the Creditors'

Committee authority to investigate and bring action on claims based on deficiencies in

lien perfection[33] within a specified time.

Finally, the Final DIP Order provided for the Tranche C Loan previously

described to be funded, in an amount "not less than $950,000,000" at the time, to fund the

---

[28]   *Id.*  The "Prepetition Senior Facilities Secured Parties," referred to here, in shorthand, as the
      "**Prepetition Secured Lenders**," were Old GM's prepetition lenders—including, most
      significantly, JP Morgan Chase and the other lenders under the Term Loan—under a number of
      secured borrowing facilities.  Thus the DIP lenders would get liens on most of the avoidance
      actions, but wouldn't get a lien on avoidance actions against Old GM's Prepetition Secured
      Lenders, including those in the Term Loan Action.

[29]   By this time, June 25, the motion for approval of the 363 sale had been filed, but the hearing on
      approval had not yet commenced; it would begin on June 30.

[30]   Final DIP Order at 15-16, ¶ 6.

[31]   *Id.* at 16.

[32]   *Id.* at 22-24, ¶ 19(a), (d).

[33]   *Id.* at 24, ¶ 19(d).

Debtors' Wind-Down, which was there defined as the "Wind-Down Facility."[34]  It was to

be "subject to an appropriate amendment to the DIP Credit Facility, acceptable to the

Debtors and the DIP Lenders," though with the Creditors' Committee to be included as

part of the drafting process.[35]  The amendment had to be approved by the Court; the

motion for approval of that amendment could be heard on as little as three days notice.[36]

*3.  The Wind-Down Financing Order and Related Documents*

On the following Monday, June 29, the Debtors filed the contemplated motion

(the "**Wind-Down Amendment Approval Motion**") for DIP financing amendment to

implement the Wind-Down.[37]  It would provide an amended and restated facility

("**Amended DIP Facility**") whose contractual terms were to be set forth in an amended

loan agreement (the "**Wind-Down Borrowing Agreement**"), in an amount "not less than

$950 million"[38] to finance Old GM's working capital needs incurred in connection with

the Wind-Down after the contemplated 363 sale, including expenses of administration.[39]

The Wind-Down Amendment Approval Motion reminded the reader that the

earlier DIP Financing Motion and DIP Facility had contemplated the Amended DIP

Facility.[40]  Noting that the Debtors and the "Purchaser"—the entity that would become

New GM—wanted to close as promptly as possible after an approval of the 363 sale, the

---

[34]    *Id.* at 27, ¶ 21.

[35]    *Id.*

[36]    *Id.*

[37]    ECF #2755.

[38]    Wind-Down Amendment Approval Motion ¶ 10(g).

[39]    *Id.* ¶ 10(i).

[40]    *Id.* ¶¶ 6, 7, 8.

Debtors advised that they were "currently finalizing" the terms of the Amended DIP

Facility with the DIP Lenders.[41]

Nevertheless, the Debtors listed the "primary terms" of the Amended DIP Facility

"as contemplated as of the date of this Motion."[42]  They included:

> (d) <u>Collateral</u>.  The obligations under the Wind-
> Down Facility are to be secured by substantially all
> property and assets of the Borrower and the
> Guarantors *other than* (i) any stocks, warrants,
> options or other equity interests issued to or held by
> any Debtor pursuant to the Related Section 363
> Transactions . . . and (ii) *avoidance actions arising*
> *under chapter 5 of the Bankruptcy Code and*
> *applicable state law against the Prepetition Senior*
> *Facilities Secured Parties . . .*
>
> . . .
>
> (f) <u>Limitation on Recourse</u>.  The obligations under
> the Wind-Down Facility will be non-recourse to the
> Borrower or the Guarantors, and recourse would
> only be to the Collateral.[43]

Further describing the deal, the Debtors additionally stated, in the Wind-Down

Amendment Approval Motion:

> Significantly, the DIP Lenders have agreed (i) not
> to take a security interest in the stock of the
> Purchaser that the Debtors are receiving as
> consideration for the 363 Transaction and (ii) *not to*
> *seek recourse against the Debtors for any unpaid*
> *portion of the DIP Facility if the proceeds of the*
> *collateral security therefor are insufficient.*[44]

---

[41]    The Wind-Down Amendment Approval Motion as filed and provided to the Court did not include
a draft of the document that would become the Amended DIP Facility.  *See* ECF #2755.

[42]    *Id.* ¶ 10.

[43]    *Id.* (underlining in original; emphasis by italics added).

[44]    *Id.* ¶ 12 (emphasis added).

At the hearing on the proposed 363 sale (which began the next day, June 30, 2009, and went on for three days), the Creditors' Committee announced its support for the 363 sale and the resolution of the Creditors' Committee's earlier limited objection to it, after agreements, among others, to "upsize" the Wind-Down financing, from the earlier $950 million to $1.175 billion.[45]  But I was not asked to rule on or otherwise address those concerns during the course of the 363 hearing, and whatever happened in connection with addressing the Creditors' Committee's concerns, with finalizing the Wind-Down Borrowing Agreement, and with crafting an approval order for my consideration, took place in my absence.

The 363 hearing ended on Thursday, July 2, and I issued the *363 Sale Decision*,[46] approving the 363 sale, on the evening of Sunday, July 5.  On that same evening, after review (and certain modifications) of a sale approval order that had been tendered to me for my consideration by the Debtors, I entered the order approving the 363 sale,[47] and entered another order, the Wind-Down DIP Financing Order (which likewise had been tendered to me for my consideration), approving the Amended DIP Facility.[48] The latter included, as an Exhibit, a draft of the Wind-Down Borrowing Agreement, bearing a date of July 4, the day before.[49]

---

[45]    Tr. of Hrg. on Jul 2, 2009 at 102-103.  *See also id.* at 110 (comments by Indenture Trustee Wilmington Trust as to earlier concerns that Wind-Down budget was insufficient, and that administrative expenses would "eat into" the stock and warrants that had been set aside for unsecured creditors).

[46]    ECF #2967, thereafter officially reported and considered in appellate proceedings as described in n.3 above.

[47]    ECF #2968.

[48]    ECF #2969.

[49]    *Id.* Exh. A.  That document says "Privileged and Confidential, CWT Draft 7/4/09." But it was the document that was provided to me and that was put into the public record.  Another version of that document, which in the same place says "Execution Version," appears as Mayer Decl. Exh. C in the Creditors' Committee's moving papers.  So far as I can tell, it doesn't differ in any respects

14

The Amended DIP Facility differed from the facility described in the motion in the significant respect that it was now for $1.175 billion, rather than the earlier $950 million. But more relevant to this controversy were changes in the DIP financing following entry of the Final DIP Order, which were reflected in the Wind-Down Borrowing Agreement and Wind-Down Financing Order. In the Wind-Down Financing Order, the sixth of the unnumbered decretal paragraphs (the "**Sixth Decretal Paragraph**") provided, in relevant part:

> **ORDERED** that the claims and liens granted to the DIP Lenders under the Final DIP Order shall apply as set forth therein to the Amended DIP Facility except as explicitly modified by the following upon the Effective Date . . . :
>
> (a) the claims of the DIP Lenders arising from the Amended DIP Facility, pursuant to sections 364(c)(1) and 507(b) of the Bankruptcy Code, . . . shall be and are accorded super-priority administrative expense status . . . , and, subject only to the Carve-Out, shall have priority over any and all other administrative expenses . . . arising in these cases; . . . and
>
> (b) the DIP Liens granted under the Final DIP Order (i) shall continue under the Amended DIP Facility on the Property in the same force, effect and priority as set forth in the Final DIP Order to the extent any such Property remains Property of the Debtors . . . (ii) shall continue to be subject to the Carve-Out, and (iii) shall include the proceeds of the Amended DIP Facility; provided, however, notwithstanding anything to the contrary in this Order, the Final DIP Order, DIP Credit Facility or the Amended DIP Facility, *the DIP Liens shall not include security interests in or liens on*

---

material here from the Wind-Down Borrowing Agreement that was attached to the Wind-Down Financing Order.

15

> *avoidance actions arising under chapter 5 of
> the Bankruptcy Code against the Prepetition
> Senior Facilities Secured Parties . . . or any
> stock, warrants, options or other equity
> interests in [New GM] . . . .*[50]

A separate decretal paragraph of the Wind-Down Financing Order, four

paragraphs later (the "**Tenth Decretal Paragraph**"), further provided, in relevant part:

> **ORDERED** that the Loans . . . shall be *non-
> recourse* to the Borrower and the Guarantors, *such
> that the DIP Lenders' recourse under the Amended
> DIP Facility shall be only to the Collateral* (as
> defined in the Amended DIP Facility) securing the
> DIP Loans, and nothing in this Order, the Final DIP
> Order, the DIP Credit Facility or the Amended DIP
> Facility shall, or shall be construed in any way, to
> authorize or permit the DIP Lenders to seek
> recourse against the New GM Equity Interests at
> any time . . . .[51]

The underlying Wind-Down Borrowing Agreement also had a provision relevant

here:  it defined "Collateral" to mean, in relevant part:

> all property and assets of . . . every kind or type
> whatsoever, . . . (including avoidance actions
> arising under Chapter 5 of the Bankruptcy Code and
> applicable state law *except avoidance actions
> against the Prepetition Senior Facilities Secured
> Parties* . . .).[52]

And the Wind-Down Borrowing Agreement further provided, in relevant part:

> <u>Loans</u>.  On the Effective Date, the Lenders made
> the Tranche C Term Loans in Dollars to the
> Borrower in the aggregate principal amount of
> $1,175,000,000 (the "<u>Loans</u>"). The Loans shall be

---

[50] Wind-Down Financing Order Sixth Decretal Paragraph, at 4-5 (underlining for proviso in original; emphasis by italics added).

[51] *Id.*, Tenth Decretal Paragraph, at 6 (emphasis added).

[52] Wind-Down Borrowing Agreement at 6, ¶ 1.1.

> *non-recourse* to the Borrower and the Guarantors
> and *recourse only to the Collateral*.[53]

A final version of the Wind-Down Borrowing Agreement, dated, "as of" July 10, 2009,[54] was thereafter executed. A filing by the Debtors on July 10 (providing notice of the change of the lead Debtor's corporate name, from "General Motors Corporation" to "Motors Liquidation Company" and a corresponding change in the chapter 11 case caption) reported that the closing of the 363 sale had taken place on that day.[55]

*4. The Term Loan Action*

Three weeks later, on July 31, 2009, the Creditors' Committee filed the Term Loan Action, seeking to avoid the most important of the several liens securing the Term Loan as the consequence of the mistaken, but arguably authorized, filing of a UCC-3 terminating a UCC-1 with respect to that lien. I thereafter heard argument on cross-motions for summary judgment in the Term Loan Action, and those motions are currently *sub judice*.

In the summer of 2010, Treasury raised issues as to who'd be entitled to any proceeds of the Term Loan Action, expressing its view that the DIP Lenders should be able to reach any such proceeds by reason of their SuperPri. Responding to this, in October 2010 the Creditors' Committee filed a contested matter motion in Old GM's umbrella chapter 11 case seeking, among other things, to "enforce" the Final DIP Order and the Wind-Down Order—in substance, seeking a ruling that the DIP Lenders couldn't

---

[53]    Wind-Down Borrowing Agreement at 24, ¶ 2.1. (underlining in original; emphasis by italics added).

[54]    Mayer Decl. Exh. C. *See also* n.49 above.

[55]    ECF #3090.

claim rights to any recoveries that might result in the Term Loan Action.[56]  Responding to that, Treasury asserted that the Creditors' Committee's motion should be denied for lack of a then-justiciable controversy.[57]

At the conclusion of the hearing on that motion, I ruled that the Committee's motion wasn't yet ripe for judicial adjudication.[58]  That ruling did not, however, foreclose a further application for a ruling on that matter at a later time.

Thereafter, with the support, among others, of each of the Creditors' Committee and the DIP Lenders, Old GM confirmed its plan of reorganization (the "**Plan**").  The Plan left the determination of the ownership of the Term Loan Avoidance Action to another day, for resolution either by agreement or court order.

<div align="center">Discussion</div>

<div align="center">I.</div>

<div align="center">The 12(b)(1) Motion</div>

As a preliminary matter, Treasury, joined by EDC, moves to dismiss under Fed.R.Civ.P. 12(b)(1),[59] contending once again that we don't have a justiciable case or controversy.  That motion must be denied.

Though Treasury mentions "standing" from time to time in its discussion of the applicable law (and standing is, of course, an element of the "case or controversy" requirement),[60] its contention in substance is that the controversy isn't ripe for decision.[61]

---

[56]    ECF #7226.

[57]    Treasury Response (ECF #7338) at 7-11.

[58]    Tr. of Hrg. on Oct. 21, 2010 at 110, 118-19.

[59]    At oral argument, Treasury agreed to drop another motion premised on Rule 12(b)(6), since it was subsumed within the cross-motions for summary judgment.

[60]    *See, e.g.*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-51 (1992) (requiring that a "plaintiff must have suffered an 'injury in fact' - an invasion of a legally protected interest which is

<div align="center">18</div>

I can't agree. The needs of unsecured creditors, driven by tax consequences, to a

decision before December 15—coupled with the fact that there is nothing that could

happen to make this controversy *more* ripe—make this controversy ripe for decision now.

Ripeness, unlike standing, "is peculiarly a question of timing."[62]  In general,

ensuring that a matter is ripe for adjudication "ensure[s] that a dispute has generated

injury sufficient to satisfy the case or controversy requirement of Article III."[63]

In a case, such as the one before me now, where a party seeks a declaratory

judgment, the case or controversy requirement is satisfied when "the facts alleged, under

all the circumstances, show that there is a substantial controversy, between parties having

adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a

declaratory judgment."[64]  A court must examine "(1) whether the judgment will serve a

useful purpose in clarifying or settling the legal issues involved; and (2) whether a

judgment would finalize the controversy and offer relief from uncertainty."[65]

---

[a] concrete and particularized, . . . and (b) 'actual or imminent, not "conjectural" or "hypothetical"'"; that there "be a causal connection between the injury and the conduct complained of"; and that "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'") (internal citations omitted).  Of course, there could be no serious contention that the Creditors' Committee isn't impacted by this controversy, or that its needs and concerns wouldn't be redressed by a favorable decision here; we here have two distinct constituencies competing for the first claim to a disputed potential asset.

[61] Of course, the controversy isn't about standing in the sense of the Creditors' Committee suffering an invasion of a legally protected interest.  The Creditors' Committee, on behalf of the unsecured creditor community in this case, has that.  Though standing of course requires an invasion of a legally protected interest, we here have exactly that—competing claims of the first rights to ownership of a *res*—Term Loan Action proceeds—with potential value.

[62] *Bronx Household of Faith v. Bd. of Educ.*, 492 F.3d 89, 111 (2d Cir. 2007) (internal citations omitted).

[63] *Clearing House Ass'n L.L.C. v. Cuomo*, 510 F.3d 105, 123 (2d Cir. 2007), *aff'd in part, rev'd in part on other grounds*, 129 S. Ct. 2710 (2009).

[64] *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (internal citations omitted).

[65] *Duane Reade, Inc. v. St. Paul Fire*, 411 F.3d 384, 389 (2d Cir. 2005) ("***Duane Reade***").  *See also SR Int'l Bus. Ins. Co., Ltd v. Allianz Ins. Co.*, 343 Fed. Appx. 629, 631-32 (2d Cir. 2009) (quoting *Duane Reade*).  Although each of these cases involved insurance disputes, I see no indication in

Here, with significant events having taken place since I last was asked to consider this matter, the ripeness environment has changed materially.  A reorganization plan has now been confirmed, under which December 15 has particular significance.  On December 15, according to the terms of the Plan, the Term Loan Action and its proceeds, if any, will be transferred from the Debtors to the Avoidance Action Trust (as defined by the Plan) and evaluated for income tax purposes.  As provided in section 6.5(n) of the Plan:

> [If] the Term Loan Avoidance Action Beneficiaries have not been identified on or before [December 15, 2011] either by (x) mutual agreement between the U.S. Treasury and the Creditors' Committee or (y) Final Order, then the Avoidance Action Trust Administrator shall treat the . . . Trust for . . . tax purposes as either (A) a "disputed ownership fund" . . . or (B) if permitted under applicable law and at the option of the Avoidance Action Trust Administrator, a "complex trust."

The DIP Lenders haven't challenged the legitimacy of the Creditors' Committee's concerns in this respect, and instead challenge ripeness on the assumption that the Creditors' Committee's assertions as to adverse tax consequences are true. [66]  If its recovery is treated as a disputed ownership fund, the Creditors' Committee argues, any recovery from the trust will be taxed twice. [67]  By contrast, if the beneficiaries of the trust are determined before December 15, one level of taxation could be avoided, thus allowing for greater recovery to the unsecured creditors.

---

these cases, or in logic, that a different ripeness standard should apply in declaratory judgment actions involving non-insurance-related disputes.

[66]    *See* Treasury 12b(1) Br. at 11.

[67]    *See* Creditors' Committee 12b(1) Br. at 5.

But the DIP Lenders nevertheless assert that the controversy still isn't ripe, making three contentions. First, they argue that even if I were to issue a judgment in this adversary proceeding by December 15, my judgment wouldn't be "final and dispositive," because it would remain subject to appeal. Second, they argue that because I haven't yet issued a judgment in the underlying litigation, the Lenders and the Creditors' Committee might be arguing over nothing. Third, they argue that even if I were to enter a judgment favorable to the Creditors' Committee in the underlying Term Loan Action, the Creditors' Committee might encounter difficulties in enforcing the resulting judgment.[68]  I find these contentions unpersuasive.

With respect to the first point, the DIP Lenders' finality observation is true but not conclusive. Of course the judgment entered pursuant to this decision will be subject to appeal. But the DIP Lenders have made no showing that the judgment would be insufficient to address the Creditors' Committee's tax concerns. And even if it were, it would still be a critical step toward an ultimate decision.

With respect to the second point, the Creditors' Committee has also explained the underlying economics of this controversy—with the Creditors' Committee's important observation that continued litigation of the Term Loan Action would be *counterproductive* (and not just an unwise expenditure of legal resources) for unsecured creditors if the DIP Lenders have the first claim to any Term Loan Action proceeds.[69]

---

[68]     *See* Treasury 12b(1) Br. at 11.

[69]     In its brief, *see* Creditors' Committee SJ Br. at 7, the Creditors' Committee notes that if it were successful in the Term Loan Action, amounts up to $1.5 billion (previously disbursed to members of the Term Loan syndicate on the assumption that they were secured) would come back to the estate, with a corresponding increase in the estate's unsecured claims—since the Creditors' Committee's action doesn't seek to deprive Term Loan lenders of *any* recovery, but just seeks to deny the Term Loan Lenders secured creditors' status. The Creditors' Committee further notes, in substance, that if the Term Loan Action were successful but then the DIP Lenders (and not unsecured creditors) were to get the fruits of the Term Loan Action recovery, unsecured creditors

That's not necessarily relevant to the matter of contractual interpretation without reason to believe that these concerns were discussed with the DIP Lenders or foreseeable to the latter, but it bolsters the ripeness showing.

With respect to the third point, while the DIP Lenders' prediction as to collectability may turn out to be true or true in part, that likewise is not conclusive or, indeed, relevant at all.  In many civil actions, enforcement may pose various challenges.  But that isn't a reason to find the controversy too speculative to be adjudicated.  If it were, those many cases would be dismissed on ripeness grounds long before collection efforts begin, making the plaintiff's inability to collect a self-fulfilling prophecy.

In finding the controversy to be ripe, I also find that both prongs of the *Duane Reade* test are satisfied; my decision clarifies the issue of the ownership of the proceeds of the term loan litigation and offers relief from uncertainty.  The latter is especially important here, given the impending tax deadline on December 15.

In sum, I find that the controversy is now ripe for adjudication.

## II.

### The Summary Judgment Cross-Motions

I then turn to the merits of the dispute.

*A.  Summary Judgment Standards*

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

---

would get the worst of both worlds, as unsecured creditors would not only lose the recovery but the pot available for unsecured creditors would be diluted by the Term Loan Lenders' additional unsecured claims.

law."[70]  Under basic principles, courts deciding motions for summary judgment "constru[e] the evidence in the light most favorable to the non-moving party and draw[] all reasonable inferences in its favor."[71]

Those principles apply equally in cases, like this one, in which each side moves for summary judgment.[72] As a result, "when parties have filed cross-motions for summary judgment, the court 'must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'"[73]

In interpreting contracts, the Second Circuit has held "[i]f the court finds that the contract is not ambiguous it should assign the plain and ordinary meaning to each term and interpret the contract without the aid of extrinsic evidence and it may then award summary judgment."[74] Even where language in a contract is ambiguous, a court may resolve ambiguity in contractual language as a matter of law if there is no extrinsic evidence to support one party's interpretation of the ambiguous language or if the extrinsic evidence is so one-sided that no reasonable factfinder could decide contrary to one party's interpretation.[75]

---

[70]   FED. R. CIV. P. 56(a), made applicable to this adversary proceeding by FED. R. BANKR. P. 7056; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).

[71]   *Federal Insurance Co. v. American Home Assurance Co.*, 639 F.3d 557, 566 (2d Cir. 2011) (quoting *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010)).

[72]   *Bronx Household of Faith v. Board of Educ. of City of New York*, 492 F.3d 89, 96 (2d Cir. 2007) (citing *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001)); *In re Magnesium Corp. of America*, --- B.R. ---, 2011 Bankr. LEXIS 3928, 2011 WL 4914698, *3 (Bankr. S.D.N.Y. Oct. 17, 2011) (Gerber, J.) (also considering cross-motions for summary judgment).

[73]   *Id.* (quoting *Hotel Employees & Rest. Employees Union, Local 100 v. City of New York Dep't of Parks & Recreation*, 311 F.3d 534, 543 (2d Cir. 2002)).

[74]   *International Multifoods Corp. v. Commercial Union Insurance Co.*, 309 F.3d 76, 83 (2d Cir. 2002) (quotation marks omitted).

[75]   *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 158 (2d Cir. 2000); *accord Antilles Steamship Co. v. Members of the*

## B.  Rules of Construction for Contracts and Orders

The cardinal rule of contract interpretation is to ascertain and "give effect to the expressed intentions of the parties."[76]  In determining "whether the language of the contract *and* the inferences to be drawn from it . . . are susceptible to more than one reasonable interpretation"—*i.e.*, ambiguous—the court looks to see whether it is:

> capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.[77]

A contract should be interpreted so as to give full meaning and effect to all of its provisions.[78]  In other words, contracts should be interpreted "in such a way that no language is rendered superfluous."[79]  Put a different way, a contract should not be interpreted to "render any portion meaningless."[80]

## C.  Merits of the Cross-Motions

The principal document to be construed here is an order (the Wind-Down Financing Order, which had been submitted to me for signature), implementing

---

*American Hull Insurance Syndicate*, 733 F.2d 195, 202 (2d Cir. 1984) (Newman, J., concurring) (ambiguity in a contract, in the absence of relevant extrinsic evidence, presents a question of law), quoted approvingly in *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992) ("**Seiden Associates**").

[76]   *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989).

[77]   *Seiden Associates*, 959 F.2d at 428 (internal quotation marks omitted), quoting *Walk-In Medical Centers, Inc. v. Breuer Capital Corp.*, 818 F.2d 260, 263 (2d Cir. 1987) in turn quoting *Eskimo Pie Corp. v. Whitelawn Dairies, Inc.*, 284 F.Supp. 987, 994 (S.D.N.Y. 1968) (Mansfield, J.).

[78]   *Trump-Equitable Fifth Ave. Co. v. H.R.H. Construction Corp.*, 485 N.Y.S.2d 65, 67 (1st Dep't 1985), *aff'd* 488 N.E.2d 115 (1985).

[79]   *Aeronautical Indus. Dist. Lodge 91 v. United Technologies Corp.*, 230 F.3d 569, 576 (2d Cir. 2000).

[80]   *Beal Sav. Bank v. Sommer*, 8 N.Y.3d 318, 324 (2007).  *See Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 100 (2d Cir. 1997) (noting "well-established principles of contract interpretation, which require that all provisions of a contract be read together as a harmonious whole, if possible").

arrangements that are contractual.  But the two sides here don't make distinctions

between orders, on the one hand, and contracts, on the other, with respect to principles

applicable to their construction.  For the most part, neither do I.  In this case, where I had

no view or intent as to the matter now in dispute when I signed the Wind-Down

Financing Order,[81] I construe that order very much as I'd construe a contract—though I

also rely on my knowledge of my intent when signing the Interim DIP Order, where I had

a very clear intent.[82]

The key order, as noted, is the Wind-Down Financing Order, which is the last of

the three financing orders I entered, and which reflects the final deal.[83]  The issues before

me turn not so much on the SuperPri provisions, which had already appeared in the

Interim DIP Order and the Final DIP Order, but on new language in two of the Wind-

Down Order's decretal paragraphs, the Sixth and the Tenth.

The Sixth Decretal Paragraph (with its subparagraphs (a) and (b), dealing with the

SuperPri and postpetition liens, respectively) is effectively the successor, with some

---

[81]    Sometimes a bankruptcy judge drafts an order (or otherwise has a particular intent to implement, as I had with respect to changes I made in the 363 order in this case, entered shortly before the Wind-Down Financing Order), and sometimes merely reviews a proposed order to confirm that there is nothing offensive in it, without forming any particular intent as to the meaning of any of its provisions, or, especially, how they fit together.  Here we have an instance of the latter, though I can and do use my knowledge "of the customs, practices, usages and terminology as generally understood in the particular trade or business," *see Seiden Associates*, 959 F.2d at 428—in this case, of financing orders in chapter 11 cases.  Financing orders—approving DIP financing or use of cash collateral—are frequently heavily negotiated between the parties before submission to the Court, as they embody the terms under which lenders are willing to lend or consent.  They're then submitted to the Court for approval and ultimate entry, after hearing the judge's views as to any provisions that will not be approved and/or that need to be modified.  Here, when a version of the Interim DIP Order was originally proposed, I had a very clear intent as to how that order needed to be modified—in particular, in not authorizing any access of any kind to avoidance action proceeds until the Final DIP Order was considered.  But when the Wind-Down Financing Order was entered, I had no problems with it, and had no independent intent with respect to the issues before me now.  Thus, since I had no particular intent with respect to the Wind-Down Financing Order, I have no occasion to implement such an intent, and the issues as to the construction of that order don't differ from those that I'd consider when construing a contract.

[82]    *See* pages 35-36 below.

[83]    Of course, the earlier orders are important for comparison, and by way of context.

modifications, to the earlier Paragraphs 5 and 6 of the Interim DIP Order and the Final

DIP Order.  The Sixth Decretal Paragraph begins by saying that "the claims and liens

granted to the DIP Lenders under the Final DIP Order shall apply as set forth therein to

the Amended DIP Facility except as explicitly modified by the following . . . ."  The

Sixth Decretal Paragraph's Subparagraph (b) also had a key proviso:  that

notwithstanding anything that might be found in the Final DIP Order and Wind-Down

Financing order (or their underlying contractual documents), the DIP liens wouldn't

cover the subset of all avoidance actions that might be asserted against the Prepetition

Secured Lenders, or the securities of New GM that would be obtained through the 363

sale.

But then, in addition, there was also another paragraph in the Wind-Down

Financing Order, the Tenth Decretal Paragraph—which was wholly new, and which had

neither a counterpart nor predecessor language in the earlier orders—which went hand-

in-hand with a change in the definition of "Collateral," in the underlying Wind-Down

Borrowing Agreement.  The Tenth Decretal Paragraph provided, significantly:

> **ORDERED** that the Loans . . . shall be non-
> recourse to the Borrower and the Guarantors,
> ["**Clause 1**"] such that the DIP Lenders' recourse
> under the Amended DIP Facility shall be only to the
> Collateral (as defined in the Amended DIP Facility)
> securing the DIP Loans, ["**Clause 2**"] and nothing
> in this Order, the Final DIP Order, the DIP Credit
> Facility or the Amended DIP Facility shall, or shall
> be construed in any way, to authorize or permit the
> DIP Lenders to seek recourse against the New GM
> Equity Interests at any time ["**Clause 3**"] . . . .[84]

---

[84]     Wind-Down Financing Order Tenth Decretal Paragraph, at 6.

At the same time, the Wind-Down Borrowing Agreement modified the definition of

"Collateral" to provide, as an exception to its general *inclusion* of avoidance actions,

"*except avoidance actions against the Prepetition Senior Facilities Secured Parties . . . .*"

While the DIP Lenders' position is not frivolous, it seems quite clear to me, after

examining the language in the various submissions, the timing of the documents'

execution, and other objective indicia of the parties' intent (and, of course, the rules of

construction noted above and below), that the "nonrecourse" language put into the Wind-

Down Order and Wind-Down Borrowing Agreement was intended to make clear that

assets of the Old GM estate that weren't DIP lender collateral couldn't be reached,

superseding the entitlements to the SuperPri.  I so conclude for several reasons.

### 1.  Plain Meaning

I look to the interpretive aids discussed below not because the underlying words

on which each side relies are at all ambiguous in isolation, but instead because some

ambiguities may exist because of their presence together.  The grant of the SuperPri (in

the Wind-Down Financing Order and in the Final DIP Order, which the former modified)

is not, by itself, ambiguous.  In the absence of anything more, it would plainly grant

rights of the type the DIP Lenders assert, with the result that the DIP Lenders could look

to the entirety of Old GM's assets, and not just the DIP Lenders' collateral.

But here there is more.  The word "nonrecourse" (the key word in Clause 1), by

itself, is not at all ambiguous either.  While "nonrecourse" is not a defined term under the

Bankruptcy Code, nonrecourse does have a plainly understood meaning in general.  That

plain meaning is, as the Creditors' Committee argues, that a secured lender may look

only to its collateral for recovery on the loan.[85]  Caselaw,[86] and *Collier*,[87] put forth that definition as well.

And though I don't think "nonrecourse" as used in Clause 1 was in any way ambiguous, it was in any event clarified in context by Clause 2, which in substance gave a specific example of what "nonrecourse" meant as the parties used it here—that the DIP Lenders' recourse under the Amended DIP Facility "shall be only to the Collateral."[88] There's no ambiguity in this latter respect either.  Indeed, if there's such a thing as "particularly unambiguous," it's the latter clause:  "recourse shall be only to the Collateral."  Clause 2 specifically addresses the assets to which the DIP lenders may look for their recovery, and then limits their rights to those in the "Collateral," under the separately defined, and precisely drafted, definition of "Collateral" in the Wind-Down Loan Agreement.

---

[85]   *See, e.g.*, *Black's Law Dictionary* (9th Ed. 2009), "Nonrecourse" ("Of or relating to an obligation that can be satisfied only out of the collateral securing the obligation and not out of the debtor's other assets."); *id.* "Nonrecourse Loan," as one of several definitions following "Loan" ("A secured loan that allows the lender to attach only the collateral, not the borrower's personal assets, if the loan is not repaid."); *Merriam Webster's Collegiate Dictionary* (10th Ed. 1997) at 791, "Nonrecourse" ("being or based on an agreement in which the lender has no right of recourse to the borrower's assets beyond stated limits").

[86]   *See In re 680 Fifth Ave. Assocs.*, 156 B.R. 726, 732-33 (Bankr. S.D.N.Y.) (Conrad, J.) ("A nonrecourse creditor is a creditor who has agreed to look only to its collateral for satisfaction of its debt and does not have any right to seek payment of any deficiency from a debtor's other assets."), *aff'd on opinion below*, 169 B.R. 22 (S.D.N.Y. 1993), (Sand, J.), *aff'd discussing other issues*, 29 F.3d 95 (2d Cir. 1994); *In re Dan Hixson Chevrolet Co.*, 20 B.R. 108, 110-111 (Bankr. N.D. Tex. 1982) (nonrecourse means that the lienor may look only to the property subject to his lien to satisfy his debt and cannot look to the debtor personally for payment.).

[87]   *See* 7 COLLIER ON BANKRUPTCY ¶ 1111.03[1][a][i] (16th ed. 2009) ("A lack of recourse means that a secured creditor may not pursue the debtor or its estate after realization of the collateral originally given.  A creditor may not have recourse for several different reasons.  It may contractually agree that the claim is nonrecourse; that is, it may agree to look solely to the collateral for its recovery.").

[88]   Because Clause 2 begins with "such that," I think it's better read as providing a specific example of the *consequences* of Clause 1.  If, however, it's read as standing independently, it simply provides an alternate basis for reaching the same result.

It's when we put these two individually unambiguous, and seemingly inconsistent, terms in the same document that some ambiguity may be said to result, because of the absence, in either the Wind-Down Financing Order or the Wind-Down Financing Agreement, of language (*e.g.*, "notwithstanding") unequivocally stating which term trumps the other. Plain meaning analysis helps the Creditors' Committee, but is insufficient by itself to decide the matter.

### 2. Canons of Construction

But other means exist by which the apparent inconsistency can be resolved. The tools most extensively discussed by the parties here are traditional canons of construction. The applicable principles in this regard are well established, and the parties don't differ on them; they focus instead on those principles' application.[89]

But those principles most commonly are utilized when the provisions in the instrument to be construed came into the document at the same time. Here they did not, and I think, for reasons addressed below, that the chronology by which recourse and nonrecourse provisions appeared and disappeared is significant, and provides considerable help to a court in ascertaining what the parties' deal was as it evolved. Nevertheless, especially since the parties did so, I start with the traditional canons.

I start with the principles that any agreement or order must be read as a whole; that all of its provisions must be given meaning; that those provisions should be harmonized, if possible, and that provisions must be read so that provisions are not surplusage. In that regard, the DIP Lenders argue that the provisions giving them the

---

[89] *See, e.g.*, Arg. Tr. 38 ([COUNSEL FOR EDC]: ". . . I think all parties agree on the general rules. And we're not arguing as to what rules apply, but how they're applied in this case.").

SuperPri cannot be ignored, for to do otherwise would render the *SuperPri provisions* surplusage.

But by the same token, the Creditors' Committee notes that there were *two separate* provisions in the Wind-Down Order—with one providing that avoidance actions against prepetition lenders would be specifically excluded from the DIP Lenders' collateral,[90] and with a second providing that the Wind-Down Loan would be "nonrecourse."[91]  And the Creditors' Committee invokes the rule against surplusage itself.  Applying those same principles, the Creditors' Committee argues, since under the first provision, the DIP Lenders' lien already would not reach Term Loan Action proceeds, the second provision—"nonrecourse"—must necessarily *mean something more*.  And that something more, the Creditors' Committee argues, is that the DIP Lenders can look only to their collateral for recovery, and that Term Loan Action proceeds, if any, can't be reached by the DIP lenders in any way.  To hold otherwise, the Creditors' Committee argues, would be to make the "*nonrecourse*" provision in Clause 1 surplusage, and would do similarly with the "*recourse . . . shall be only to the Collateral*" provision in Clause 2.

Even before considering the sequence in which provisions appeared and disappeared (discussed below), I find the Creditors' Committee contentions more persuasive.  I think it's clear, when we examine the Sixth and Tenth Decretal Paragraphs, that the earlier grant of the SuperPri was superseded by the new language in the Wind-Down Financing Order that added "nonrecourse"—and, importantly also, provided specifically that "recourse" would be solely to the Collateral.  I must agree with the

---

[90]        *See* page 15 & n.50 above.

[91]        *See* page 16 & n.51 above.

30

Creditors' Committee's contention[92] that the DIP Lenders' efforts to impose the SuperPri

on Term Loan Action proceeds renders the nonrecourse language superfluous, and denies

unsecured creditors their reasonable expectations based on the plain meaning of the

documents.

Putting the Sixth and Tenth Decretal Paragraphs together, we can see the

significance of the Tenth Decretal Paragraph.  Clause 3 was limited in its application to

the New GM securities, but Clauses 1 and 2 applied to the "Loans" and obligations under

the "Amended DIP Facility" as a whole.  By reason of the amendment to the definition of

"Collateral," the DIP Lenders' collateral no longer included avoidance actions against the

Prepetition Secured Lenders.  And Clause 2 said the DIP Lenders could look only to the

Collateral—from which the Term Loan Litigation was excluded.  Clause 1, and

especially Clause 2, must be assumed to have had a purpose.  That purpose, in each case,

supports the Creditors' Committee's view.

Another commonly used canon is that the more specific trumps the general.  Here

there was a general grant of both liens and a SuperPri, continuing from the earliest days

of the case when the Interim DIP Order was signed.  But a new Tenth Decretal Paragraph

was added, specifically addressing matters that the DIP lenders could not reach.  We must

presume that each clause in the Tenth Decretal Paragraph was added for one or more

purposes, and each of its clauses, to implement those purposes, needs to be respected.

   *3.  When Provisions Appeared and Disappeared*

I think the appropriate conclusion appears even more clearly when one considers

the chronology of the events, starting with the Interim DIP Order, and the documents that

---

[92] Creditors' Committee's SJ Br. at 11.

preceded it.  The intent to grant the DIP Lenders' rights to recover avoidance action

proceeds, or some of them, originally appeared, disappeared, reappeared again, and

disappeared again, if one looks at the chronology, which I think both sides (but especially

the DIP Lenders) failed satisfactorily to address.

Though changes in some respects were foreseeable,[93] we here can see a deal with

changing terms, back to the Interim DIP Order and the motion that preceded it.  As noted

above when I laid out the facts, the Debtors' first-day motion for approval of the DIP

financing expressly addressed the "recourse"-"nonrecourse" distinction in connection

with avoidance actions, but at this time it said *exactly the opposite* of what the Wind-

Down Financing Order said.  As originally proposed, the DIP Lenders *could* reach

avoidance actions.

Then, after concerns were raised by the U.S. Trustee, the Interim DIP Order was

modified to deprive the DIP Lenders the recourse to avoidance action proceeds that the

DIP Financing motion had described as part of the deal.  Such a change was necessary,

based on my view that one shouldn't prejudice unsecured creditors before they've even

appeared in the case.  Thus, when I entered the Interim DIP Order, the DIP Lenders

*couldn't* reach avoidance actions.

Then, when the Final DIP Order was up for consideration (by which time the

Creditors' Committee was now in place), the provisions were modified again.  Now the

DIP lenders *could*, again, reach at least many avoidance actions.

---

[93]     For instance, bankruptcy judges rarely permit liens on avoidance actions at the Interim DIP Order
        stage or allow SuperPri rights to reach proceeds of avoidance actions at that time, but revisit the
        matter when the Final DIP Order is considered.  Also, this deal contemplated a future "Tranche C"
        of DIP financing, which from the start was to be "nonrecourse."  *See* page 8 above.

Then, when the Wind-Down Financing Order was entered, the DIP Lenders could reach some, but not all, avoidance actions. The DIP Lenders *could* reach most of the avoidance actions, but *couldn't* reach avoidance actions (like the Term Loan Action) against the Prepetition Secured Lenders.

Of course, these don't represent conclusions as to the construction of documents that were executed at the same time. They represent stages of an evolving deal. I reach the conclusions just described for reasons that follow.

### (a) The Debtors' Motion

As noted above, the Debtors' first-day motion said:

> The DIP Lenders' (a) *administrative expense claim*, (b) *DIP Liens*, and (c) adequate protection liens, *may be payable from or have recourse to* the proceeds of avoidance actions arising under chapter 5 of the Bankruptcy Code or applicable state law.[94]

The Debtors couldn't have described the parties' intent more clearly. At the outset, as proposed, the DIP Lenders would have liens on avoidance actions (at this time, all of them), and their SuperPri could reach the proceeds of those actions as well.

The Debtors' statement is significant because the Debtors' motion addressed the matter of "recourse" or "nonrecourse" not just with respect to liens, *but also with respect to the SuperPri.*[95] Pruning the language just quoted to its essentials, the motion said that "[t]he DIP Lenders' (a) *administrative expense* [*i.e.*, SuperPri] claim . . . *may be payable from* or *have recourse to* the proceeds of avoidance actions." By this, the Debtors made clear to anyone reading the motion that "recourse" to the proceeds of avoidance actions

---

[94]     Interim DIP Motion at 6, ¶ (x) (emphasis added).

[95]     *Id.* ("The DIP Lenders' (a) administrative expense claim . . . may be payable from or have recourse to the proceeds of avoidance actions . . . .").

could and did apply to a SuperPri claim, and that the "recourse"-"nonrecourse"

distinction applied to SuperPri claims as well.

In oral argument on the motion, counsel for EDC stated that

> [W]e believe that recourse is purely a concept that's
> used in collateral, secured loan context.  So . . . we
> didn't find any context . . . outside of a secured loan
> context where recourse was used.[96]

For reasons apparent from the language quoted from the Debtors' motion, I

cannot agree.  The express language in the Debtors' motion that the SuperPri would have

"recourse to the proceeds of avoidance actions" made clear that the recourse (and by

implication, nonrecourse) concept would not at all be limited to the DIP Lenders' liens.

*(b) Changes in Interim DIP Order*

Then, the Interim DIP order as entered had changes in it from the way it was

originally proposed.  As noted above, the U.S. Trustee announced that she'd agreed with

Treasury's attorney that there would be "no lien on the avoidance actions . . . pending the

final order."[97]  But she was silent on whether she'd likewise agreed that the SuperPri at

the time would not reach the avoidance actions, without which her agreement would be

meaningless.  Treasury confirmed that the agreement was in place "as described," but

otherwise was silent as to the deal or its intent.  But I had an intent, as discussed below.

The change that the U.S. Trustee and Treasury's counsel agreed upon resulted in

changes in two places in the Interim DIP Order where the description of the relief being

sought was described.  In each place, the words, "(including all avoidance actions arising

under chapter 5 of the Bankruptcy Code and applicable state law)" were taken out of the

---

[96]        Arg. Tr. at 37-38.

[97]        *See* n.23 above.

description of the relief that the Debtors had requested.  But *there was no change in the actual granting clauses*, ¶¶ 5 and 6 of the Interim DIP Order—¶5, which dealt with the SuperPri, and ¶ 6, which dealt with the liens.  Nor were there changes in the underlying loan agreement.

With the benefit of hindsight (outside of the pressured environment in which everyone was working at the time), the changes made were less than optimum.  The changes should have been made not in the description of what the Debtors were asking for, but rather in the two *granting clauses*—¶ 5, which granted the SuperPri, and ¶ 6, which granted the liens.[98]  And though the Interim DIP Order provided that it would trump inconsistent provisions in the underlying loan agreement,[99] "best practices" would have called for similar changes to have been made in the underlying loan agreement.

Nevertheless, the purpose of the change was clear, as was my intent when I entered the Interim DIP Order.[100]  The change the US Trustee had requested and agreed upon had to, and did, cover both the liens and the SuperPri.  If it hadn't, the change would have been useless.[101]  Pending the final hearing, at which time the Creditors'

---

[98]    For instance, each could have said, in words, or substance, "provided, that notwithstanding the foregoing, pending the final hearing, the SuperPri [or liens] granted herein shall not be payable from the proceeds of avoidance actions."

[99]    Interim DIP Order at 23, ¶ 21.

[100]    The underlying philosophy on first day motions (and especially financing motions), or at least mine, is, as medical students are taught, to "do no harm."  At the outset of a chapter 11 case, the bankruptcy judge wants the debtor to hit the ground running and get the essential liquidity it needs.  But the judge also wants to avoid undue prejudice to parties who haven't yet had a chance to be heard.  On the first day of a case, when a creditors' committee has not yet been appointed, I grant liens on avoidance actions only as a last resort (typically, only when there are no practical alternatives, such as when there is no alternative means to provide a prepetition secured lender a substitute lien as adequate protection), because of their potentially deleterious effect on unsecured creditor recoveries.

[101]    I've commented on these issues in other cases, taking a fact-specific approach as to the extent to which I'd grant access to avoidance action proceeds by means of a lien or a SuperPri, considering them together.  For example, as I stated at the hearing on final DIP financing in *Lyondell Chemical*, a few months prior to the filing of the Old GM chapter 11 case:

35

Committee and other creditors would have their first opportunity to be heard, the DIP

Lenders were not to be able to reach the proceeds of avoidance actions in any way.[102]

---

> Other matters: Liens on avoidance actions. The Creditors'
> Committee also objects to granting liens on avoidance actions
> and to allowing SuperPri entitlements to reach avoidance
> action proceeds. Ultimately I find what was done here to be
> acceptable, but I need to explain why.
>
> The lenders argued that they drafted their entitlement in this
> area to only obtain a lien on the proceeds of avoidance actions
> and not liens on the actions themselves. Drafting to recognize
> that distinction affects who gets to control those actions, and
> that's no small thing. But it isn't the only issue.
>
> The more important issue, of course, is who gets the economic
> benefit of any avoidance actions that turn out to be successful.
> As I said in my 2008 decision in *AppliedTheory,* 2008 WL
> 1869770, there is no hard and fast prohibition against granting
> liens on avoidance actions, or granting SuperPri claims that
> would have the same economic substance, that is, allowing the
> SuperPri to siphon off value that would otherwise be available
> for admin claims or general unsecured claims. Rather, what
> we look to do is to see whether granting a lien on avoidance
> actions is appropriate to secure the postpetition lending or to
> provide a substitute lien or alternative means to provide
> adequate protection.
>
> As [counsel for the *Lyondell Chemical* DIP lenders] properly
> observed, proceeds of avoidance actions are property of the
> estate. So there's nothing inherently wrong with allowing
> them to be used to satisfy claims in order of priority. But he
> also recognized prepetition security interests did not attach to
> avoidance action proceeds. So the real issue here is whether I
> should allow adequate protection liens and SuperPri
> entitlements to latch onto them now.

Tr. of Hrg. on Feb. 27, 2009, *In re Lyondell Chemical Co.*, No. 09-10023, EFC #3740, at 747-48
(transcription errors corrected).

[102]  Bankruptcy judges with experience in considering DIP financing motions have long been sensitive
to this concern. Protecting avoidance action proceeds from liens without doing likewise from the
SuperPri does no good. As early as 2002, the judges of this Court recognized this problem when
we enacted our Guidelines for Financing Requests, requiring express disclosure of grants of rights
of this character so we could limit them—including them as "Extraordinary Provisions" "that
ordinarily will not be approved in interim orders without substantial cause shown, compelling
circumstances, and reasonable notice." General Order No. M-274, "Guidelines for Financing
Requests" (Sept. 9, 2002), at 2. We provided, in this respect:

> Liens on avoidance actions. Extraordinary Provisions include
> *the granting of liens* on the debtor's claims and causes of
> action arising under sections 544, 545, 547, 548 and 549 (but
> not liens on recoveries under section 549 on account of
> collateral as to which the lender has a postpetition lien), and
> the proceeds thereof, *or a superpriority administrative claim*

Thus, by the second day of the case, June 2, the earlier proposed grant of recourse to avoidance action proceeds—through either liens or SuperPri—had had been taken away.

### (c)  Changes in Final DIP Order

The deal with respect to recourse to avoidance action proceeds changed once again when the Final DIP Order was entered.  As noted above,[103] the Final DIP Order described the underlying motion as seeking liens on all Old GM property, including avoidance actions, but *with an exception*—avoidance actions against the Prepetition Secured Lenders.  This, of course, was a third variant of the deal since the chapter 11 case was filed.

Under the Final DIP Order, the DIP Lenders took liens on the bulk of potential avoidance actions, but did not get liens on avoidance actions against the Prepetition Secured Lenders.  But there was an ambiguity in the documents as to whether the DIP Lenders could reach proceeds of avoidance actions against Prepetition Secured Lenders through the SuperPri—since there was no language in the Final DIP Order like that in other documents, earlier and later, that spoke of rights to avoidance actions being either "recourse" or "nonrecourse."

---

> *payable from the proceeds of such claims and causes of action.*

*Id.* at 10, ¶ 6 (underlining in original; emphasis by italics added).

It is also important to note, that as the quoted language makes clear, the words "Liens on avoidance actions"—there used in the heading for that provision—have at least sometimes been used as a catchall to describe *any* provisions that trap the proceeds of avoidance actions, not just liens—and to expressly include SuperPri provisions that can reach the proceeds of avoidance actions.

[103]   *See* page 10 above.

37

While I think that the better view (in the absence of any language suggesting otherwise) is that the DIP Lenders' SuperPri *could* reach proceeds of avoidance actions against the Prepetition Secured Lenders under the Final DIP Order, I don't need to decide that issue, since the deal was changed, thereafter, making that question moot. But we can see that as of this time, the deal had evolved once again. As of the time of entry of the Final DIP Order, the DIP Lenders definitely had liens on avoidance actions generally; did *not* have liens on avoidance actions against Prepetition Secured Lenders; and probably (but not clearly) could reach proceeds of such actions through the SuperPri.

*(d) Changes in Wind-Down Financing Order*

With the Wind-Down Financing Motion and Wind-Down Financing Order, the deal changed once again. Now, as previously noted, the Wind-Down Financing Order, with its Sixth Decretal Paragraph, continued the earlier grants of the SuperPri and the liens, pursuant to the earlier ¶¶ 5 and 6 of the Final DIP Order, as modified. And one of the Wind-Down Financing Order's modifications expressly provided that the DIP Lenders' liens would not cover avoidance actions against Prepetition Secured Lenders. But the Wind-Down Financing Order added a new *Tenth Decretal Paragraph*, which had no counterpart in the earlier orders, which, while consistent with the Sixth Decretal Paragraph, went further. While already providing that DIP Lenders' liens would not cover those avoidance actions, it additionally provided that the Loans would be "nonrecourse," and, for good measure, that the DIP Lenders' recourse under the Amended DIP Facility "shall be only to the Collateral."

I think that review of the history makes the intent of the parties quite clear, and that, frankly, it's a mistake to try to construe the documents (and the Wind-Down

Financing Order in particular) as if all of the potentially relevant provisions came into the Wind-Down Financing Order at the same time.  This was an evolving deal, and the inclusion and deletion of provisions relating to the avoidance actions tells a story.  That story tells me that the addition of the Tenth Decretal Paragraph in the Wind-Down Financing Order was a highly significant act, with significant purpose and effect.  With "nonrecourse" having been added last, it must be understood as trumping SuperPri language first appearing much earlier.[104]

As a consequence of the addition of the Tenth Decretal Paragraph, the scope of the SuperPri was meaningfully narrowed.  The SuperPri no longer could reach proceeds of avoidance actions against the Prepetition Secured Lenders.[105]

### 4. Contemporaneous Statements of the Parties' Intent

Contemporaneous statements as to the parties' intent further support the Creditors' Committee's view.  As previously discussed, the Debtors noted, in the Wind-Down Amendment Approval Motion, how the definition of "Collateral" would be narrowed to exclude avoidance actions against the Prepetition Secured Lenders.  And the Debtor then expressly noted that:

---

[104]    The Creditors' Committee asserted, in oral argument, that the "documents were in the care and feeding of Treasury's counsel from day one," Arg. Tr. at 56, suggesting that I should thus construe the documents against the drafter.  *Id.* at 57.  While if we were at the trial stage, I might be able to draw such an inference (based, *e.g.*, on the proposed Interim DIP Order and Wind-Down Borrowing Agreement, each of which says "CWT Draft"), the record now is very thin on this issue.  Also, I don't know the extent to which others had an opportunity to comment on Cadwalader drafts, even if Cadwalader, Treasury's outside counsel, did have drafting control over the document.  Thus I don't think I should be drawing the requested inference at this time, or, of course, that I should be construing the Wind-Down Financing Order against Treasury in reliance on such an inference.

[105]    To complete the picture, though it's not at issue here, the DIP Lenders could still reach the proceeds of *other* avoidance actions, because they remained part of the DIP Lenders' collateral, which the DIP Lenders could reach even with a nonrecourse loan.

> The obligations under the Wind-Down Facility will
> be non-recourse to the Borrower or the Guarantors,
> and *recourse would only be to the Collateral*.[106]

That unambiguous statement of intent once more supports the Creditors' Committee's

view.  A further statement, to the effect that there's an exception to that, is conspicuously

lacking.

Indeed, the Debtors said more.  They also said, in the Wind-Down Amendment

Approval Motion:

> *Significantly*, the DIP Lenders have agreed . . .
> (ii) *not to seek recourse against the Debtors* for any
> unpaid portion of the DIP Facility if the proceeds of
> the collateral security therefor are insufficient.[107]

That statement spoke directly to the DIP Lenders' agreement not to seek recourse against

the Debtors—which is exactly what an unrestricted SuperPri would do.  And the Debtors

observation began with the word "[s]ignificantly."  If that agreement didn't also cover the

SuperPri, the DIP Lenders' agreement wouldn't be significant at all.  Far from being

"[s]ignificant[]," it would be meaningless.

Similarly, during the third day of trial at the 363 Sale Hearing, on July 2, 2009,

just before I considered the Wind-Down Amendment Approval Motion, Treasury's

counsel affirmed the Creditors' Committee's representations regarding the Wind-Down

Loan, and supplemented them by saying:

> I should make clear that the funding facility is on a
> non-recourse basis, as has been the case throughout
> these discussions.[108]

Here again, there were no stated no exceptions to that.

---

[106]    Wind-Down Amendment Approval Motion at 4, ¶ 10(f) (emphasis added).

[107]    *Id.* at 6, ¶ 12 (emphasis added).

[108]    Tr. of Hrg. on Jul. 2, 2009 at 103.

The Creditors' Committee contends that Treasury should be estopped from now contending to the contrary,[109] and that I should apply the doctrine of judicial estoppel to hold Treasury (and EDC, which acted through Treasury) to that nonrecourse deal. I don't need to go that far; there's no need to apply judicial estoppel doctrine. I think counsel for Treasury merely candidly stated his understanding of the deal at the time, consistent with what the documents said, and what the chronology shows. There is no reason to believe, nor any evidence in the record, to suggest that he told me a half-truth—which is what acceptance of the DIP Lenders' present contentions would require me to find.[110]

### 5. *Avoiding Absurd Result*

Finally, just as a statute may be construed to avoid an absurd result, I think the Wind-Down Financing Agreement Order should be construed similarly. To accept the view urged by the DIP Lenders, I'd have to assume that the Creditors' Committee would have gone to all of the trouble to request the nonrecourse provisions in the Tenth Decretal Paragraph (and that recourse on the Wind-Down Loan be limited to the DIP Lenders expressly limited collateral), all to the end that the revision would be useless—and that the very change requested by the Creditors' Committee would have no effect whatever.

I can't construe the Wind-Down Financing Order in that fashion without evidence of anyone's intent that the Creditors' Committee engage in a meaningless act.

---

[109]    *See* Creditors' Committee SJ Reply Br. at 2 n.2.

[110]    It also, of course, is exactly the same as what the Debtors told me. I here have two separate parties in the case (one, Old GM, which had no dog in this fight, and one, Treasury, which described the deal in the Creditors' Committee's terms) each confirming the Creditors' Committee's account of the deal.

### 6. Other DIP Lender Contentions

I turn then to other DIP lender contentions, to the extent they haven't previously

been addressed.

### (a) SuperPri as Surplusage

In concluding that "nonrecourse" must be construed so as not to be surplusage

(and that "the DIP Lenders' recourse under the Amended DIP Facility shall be only to the

collateral" must be construed likewise), I'm mindful of the DIP Lenders' contention that

the SuperPri shouldn't be surplusage, either.

But I don't think acceptance of the Creditors' Committee's contentions results in

a construction that makes the SuperPri surplusage, for several reasons.  First, the fact that

by agreement, the SuperPri was cut back in coverage over time does not make it

"surplusage" when it was first put into place, or thereafter.  Cutting back on the

provision's scope was simply a decision the parties had the right to make.  Second, even

with acceptance of the Creditors' Committee's "nonrecourse" contentions, the SuperPri

continues to have significance, even if it does not reach the Term Loan Action, for

reasons explained by the Creditors' Committee in its papers—that "a DIP lender who

obtained only a lien and no administrative expense or superpriority claim could be

'crammed down' through payments over time under sections 1129(b)(1) and

1129(b)(2)(A)"[111] of the Code.  Granting the seemingly duplicative lien and SuperPri

rights obviates this result. That explains the inclusion of the SuperPri at the outset, and its

continuing importance now.

---

[111]    Creditors' Committee SJ Brief at 12, n.11.

*(b) Different Means of Expression for "Nonrecourse,"
    Carve-Out and Rights to Equity Interests*

Treasury also notes that the Wind-Down Financing Order expressly excluded

funds for the *Carve-Out* not only from the DIP Lenders' collateral, but also from assets

that could be used to pay the SuperPri, and contends that the lack of an exclusion, in the

same fashion, for any Term Loan Action proceeds is significant. Treasury argues, based

on that, that "had the parties agreed to exclude [Term Loan Action] proceeds from the

universe of estate assets that could be used to repay the DIP Lenders . . ., the parties knew

how to say so, and would have done so. But they did not."[112]

I had regarded this point as a fairly strong one when I first read the papers, and

even at the time of oral argument. But now that I understand the drafting better, and the

chronology, I find it ultimately unpersuasive.

As the earlier discussion of the chronology makes clear, the Carve-Out dated from

the earliest days of the case, and continued without material change. But as recourse

provisions were later taken out and re-inserted into the documents, the changes were

effected in different ways. By contrast to the Carve-Out (which was dealt with by

provisos in ¶¶ 5 and 6 of the Interim DIP Order and Final DIP Order, and in the Sixth

Decretal Paragraph of the Wind-Down Order modifying ¶¶ 5 and 6), lack of recourse to

New GM Equity Interests and to avoidance action proceeds was dealt with in a variety of

ways—most significantly in the Tenth Decretal Paragraph, whose insertion, I think, was a

watershed event.

It's rather obvious, when one looks at the history, that the Sixth and Tenth

Decretal Paragraphs (and particularly the latter) became the vehicles for addressing what

---

[112]     Treasury SJ Br. at 2-3.

assets could be reached, and what assets couldn't be, under the liens and SuperPri. They

represented the latest thinking on the subject. That latest thinking was embodied in a

new, separate, Tenth Decretal Paragraph, and it simply was evidenced in a manner

different than that with respect to the Carve-Out, which never changed over time.

Likewise, I know from what was told to me that protecting the New GM Equity

Interests—the sole meaningful source of unsecured creditor recoveries—was

extraordinarily important to the Creditors' Committee, and thus am not surprised that the

parties papered protection for that in three separate ways. But that doesn't cause me to

conclude that a separate provision that unsecured creditors desired should be disregarded

because it was stated only twice.[113]

Thus I must conclude that the use of different means over time to express

elements of the deal doesn't make any otherwise unambiguous terms any less operative.

### (c) Rights under Section 1129(a)(9)

The parties' ability to change their deal over time also goes to another of the DIP

Lenders' contentions—their point that under section 1129(a)(9) of the Code,[114] they'd be

entitled to payment of their administrative expense claims, including their SuperPri, in

full. Based on that, the DIP Lenders argue that the Creditors' Committee hasn't

---

[113]    *I.e.*, in Wind-Down Financing Order Tenth Decretal Paragraph Clause 1 (Wind-Down Loan is to
be "nonrecourse"); *id.* Clause 2 ("the DIP Lenders' recourse under the Amended DIP Facility shall
be only to the Collateral (as defined in the Amended DIP Facility) securing the DIP Loans").

[114]    It provides, in relevant part:

(9) Except to the extent that the holder of a particular claim
has agreed to a different treatment of such claim, the plan
provides that—

    (A) with respect to a claim of a kind specified in
    section 507(a)(2) or 507(a)(3) of this title, on the
    effective date of the plan, the holder of such claim
    will receive on account of such claim cash equal to
    the allowed amount of such claim . . . .

overcome the "fundamental bankruptcy precept that DIP Lenders are entitled to cash payment in full of their superpriority expense claim."[115]

But I can't agree with this contention. Here the DIP Lenders give insufficient attention to the point that section 1129(a)(9) applies "unless otherwise agreed." And by the inclusion of the Tenth Decretal Paragraph in the Wind-Down Financing Order, the DIP Lenders did exactly that.

*(d) Nonrecourse as Limiting Only Prepetition Claims*

The DIP Lenders, and particularly EDC, further argue that "nonrecourse" should be understood as limiting their rights only with respect to *prepetition* claims, and that it was intended to cover only those. I find these contentions unpersuasive.

When a lender makes a postpetition loan to a chapter 11 estate, the transaction gives rise to a postpetition, administrative, claim—not a prepetition claim. Even assuming that the law were otherwise, no lender in its right mind would make a postpetition loan to an estate if the repayment obligation only unsecured claim status. A construction here based on that premise would be absurd.

Along the same lines, I must disagree with the DIP Lenders' assertion that section 1111 of the Code "contradicts the Committee's assertion that, by deeming the loan non-recourse, the DIP Lenders waived their right to payment of their administrative claim from Avoidance Action proceeds."[116]

Section 1111 gives secured lenders rights to maximize their ability to be repaid in many nonrecourse loan situations, and it is indeed, as the DIP lenders argue, the only section of the Code that expressly uses the term "nonrecourse." But section 1111 doesn't

---

115 Treasury SJ Br. at 15 (capitalization altered).

116 *Id.* at 19.

apply to postpetition DIP financing.  That can be seen by its language, as stated in section

1111(b)(1)(A), providing that "[a] claim secured by a lien on property of the estate shall

be allowed or disallowed under section 502 of this title . . . ."  Section 502 doesn't

address claims arising after the order for relief.  That can be seen (apart from its

statement that, with limited exceptions, claims are determined "as of the date of filing of

the petition")[117] by section 502's reference to a "claim . . . proof of which is filed under

section 501 . . . ."[118]  Section 501, in turn, provides that a "*creditor* . . . may file a proof of

claim,"[119] and "creditor" is defined under the Code as one that has a *prepetition* claim.[120]

Construing "nonrecourse" in this context on the assumption that the parties

thought it would apply only to prepetition claims would rest on a premise alien to the

entire bankruptcy community.  There is no basis upon which I could ever find such an

intent.

*(e)  Creditors' Committee's Derivative Authority*

Treasury further points out that the Creditors' Committee is acting only

derivatively for the Old GM estate; the Creditors' Committee's ability to do so does not

equate to ownership of the proceeds; that any recovery the Creditors' Committee might

secure would be for the benefit of all; and that any recoveries the Creditors' Committee

might secure would have to be distributed in accordance with "the Bankruptcy Code's

carefully established order of priority among creditors."[121]

---

[117]     Bankruptcy Code section 502(b).

[118]     *Id.* section 502(a).

[119]     *Id.* section 501(a) (emphasis added).

[120]     *See id.* section 101(10) (along with some additional types of claims not relevant here, a "creditor" is an "(A) entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor . . . .").

[121]     Treasury SJ Br. at 10-14.

All of this of course is true.[122]  But it begs the question.  The "order of priority among creditors" is the consequence of the agreements they made, and the orders I entered—each of which provided that the DIP Lenders' recourse under the Wind-Down Facility would be only to their Collateral.

### Conclusion

Thus I find "nonrecourse" must be construed to mean what it says.  And the clause that says "the DIP Lenders' recourse under the Amended DIP Facility shall be only to the Collateral" must be construed likewise.  Having been specifically added in the new Tenth Decretal Paragraph of the Wind-Down Financing Order, these provisions limit earlier, and other, grants of the SuperPri.  The DIP Lenders cannot reach, through their liens or now-narrowed SuperPri, any proceeds of the Term Loan Action.

Treasury's motion to dismiss, under Fed.R.Civ.P.12 (b)(1), is denied.

The Creditors' Committee's motion for summary judgment in its favor is granted, and the DIP Lenders' motion for summary judgment in their favor is denied.

---

[122]    Though it is ultimately not dispositive here, I can't agree with the Creditors' Committee's assertion that it here is "not a fiduciary . . . even for the estate," and instead "is a fiduciary for unsecured creditors."  *See* Creditors' Committee SJ Reply Br. at 4, quoting *In re SPM Mfg. Corp.*, 984 F.2d 1305, 1315-16 (1st Cir. 1993), and *In re Johns-Manville Corp.*, 60 B.R. 842, 853 (S.D.N.Y.), *rev'd on other grounds*, 801 F.2d 60 (2d Cir. 1986)); *accord* Creditors' Committee SJ Br. at 12 n.12.  While the latter statement is generally true, the Creditors' Committee fails to make the necessary distinctions between its role on the motions here (where it can properly act on behalf of the unsecured creditors community) and its role in the separate Term Loan Action, for whom the Creditors' Committee has been carrying the sword for the entire Old GM estate.  The statements in *SPM* and *Johns Manville*, with which I concur as a broad general matter, cannot be extended to apply to a situation, like this one, where a creditors committee has been deputized, under *STN*, *Commodore*, or *Housecraft* authority (or by a DIP financing order, authorizing a creditors committee to act under what in substance is *Commodore* authority), to act for the estate as a whole.  Under such circumstances, a creditors' committee takes on fiduciary duties not just for the narrower constituency for whom it originally acted (and for whom it may still act in other contexts), but also for the entity (typically the entire estate) for whom it was deputized to act.

The Creditors' Committee is to settle a stand-alone judgment, pursuant to

Fed.R.Civ.P. 54 and 58, consistent with this decision.  The time to appeal from that

judgment will run from the date of its entry, and not the date of this decision.


Dated: New York, New York                    _*s/Robert E. Gerber*_____
      November **_28_**, 2011                     United States Bankruptcy Judge