**HEARING DATE AND TIME: August 10, 2016 at 2:00 p.m. (Eastern Time)**

Thomas Moers Mayer
Robert T. Schmidt
Jonathan M. Wagner
Jennifer Sharret
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036
(212) 715-9100

*Attorneys for Official Committee of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------------x

In re:                                                        Chapter 11

MOTORS LIQUIDATION COMPANY, f/k/a
GENERAL MOTORS CORPORATION, *et al.*,          Case No. 09-50026 (MG)
                                                              (Jointly Administered)

                              Debtors.

-------------------------------------------------------------------------x

OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF MOTORS LIQUIDATION
COMPANY, *et al.*,
                                                              Adversary Proceeding
                              Plaintiff,                      No. 11-09406 (MG)

        - against –

UNITED STATES DEPARTMENT OF THE TREASURY
and EXPORT DEVELOPMENT CANADA,

                              Defendants.

-------------------------------------------------------------------------x

**OMNIBUS REPLY OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
TO OBJECTIONS FOR ENTRY OF (A) STIPULATION AND AGREED ORDER
(I) SETTLING DISPUTED ENTITLEMENTS OF DEBTOR-IN-POSSESSION
LENDERS AND OFFICIAL COMMITTEE OF UNSECURED CREDITORS
TO POTENTIAL TERM LOAN AVOIDANCE ACTION PROCEEDS AND
(II) MODIFYING AVOIDANCE ACTION TRUST AGREEMENT TO
IMPLEMENT SETTLEMENT, AND (B) ORDER (I) APPROVING SETTLEMENT
OF THE ALLOCATION DISPUTE, (II) APPROVING AMENDMENTS TO THE
AVOIDANCE ACTION TRUST AGREEMENT, AND (III) AUTHORIZING THE
AVOIDANCE ACTION TRUST TO GRANT A LIEN TO THE DIP LENDERS**

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................................ii

PRELIMINARY STATEMENT .............................................................................................. 1

REPLY .................................................................................................................................... 2

    A.    The Settlement resulted from arms-length bargaining over a lengthy period of time. ....................................................................................................................... 2

    B.    The Settlement Meets the Iridium Factors and Should be Approved. .................... 4

    C.    The Court Has Authority to Approve the Settlement ............................................. 9

    D.    The Objections' Analyses are Flawed ................................................................. 10

CONCLUSION ..................................................................................................................... 11

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Elec. Books Antitrust Litig.*,
   639 F. App'x 724 (2d Cir. 2016) ............................................................................ 10

*Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating L.L.C.)*,
   478 F.3d 452 (2d Cir. 2007) ........................................................................... *passim*

*Official Comm. of Unsecured Creditors of Motors Liquidation Co. v. U.S. Dep't of the Treasury
(In re Motors Liquidation Co.)*,
   460 B.R. 603 (Bankr. S.D.N.Y. 2011) ......................................................................5

*In re Remsen Partners, Ltd.*,
   294 B.R. 557 (Bankr. S.D.N.Y. 2003) ..................................................................... 7

TO:    **THE HONORABLE MARTIN GLENN,**
       **UNITED STATES BANKRUPTCY JUDGE:**

The Official Committee of Unsecured Creditors of Motors Liquidation Company f/k/a General Motors Corporation (the "**Committee**") files this omnibus reply (the "**Reply**") to objections filed by River Birch Capital ("**River Birch Objection**") [Adv. Pro No.  11-09406 Dkt. No. 44] and Davidson Kempner ("**DK Objection**" [Adv. Pro No. 11-09406 Dkt. No. 47], and together with the River Birch Objection, the "**Objections**" filed by the "**Objectors**") to the Joint Motion (the "**Motion**") of the Motors Liquidation Company Avoidance Action Trust and the Committee for entry of (A) Stipulation and Agreed Order (I) settling disputed entitlements of debtor-in-possession lenders and the Committee to potential Term Loan Avoidance Action proceeds, and (II) modifying Avoidance Action Trust Agreement to implement the settlement, and (B) Order  (I) approving settlement of the Allocation Dispute (II) approving amendments to the Avoidance Action Trust Agreement and (III) authorizing the Avoidance Action Trust to grant a lien to the DIP Lenders [Adv. Pro No.  11-09406 Dkt. No. 42].  The Declaration of Thomas Moers Mayer (the "**Mayer Declaration**") is filed contemporaneously with this Reply in support of the Reply and in further support of the Motion.  In support of the Reply, the Committee respectfully states as follows.[1]

## PRELIMINARY STATEMENT

1.    Although the Objections appear to question the reasonableness of the settlement of the Allocation Dispute, the Objections principally focus on whether it was appropriate to settle the Allocation Dispute in conjunction with the DIP Lenders' agreement to provide a $15 million Litigation Cost Advance to the Avoidance Action Trust.  The Objectors,

---

[1] Capitalized terms not otherwise described herein have the meaning ascribe to them in the Motion.

both of whom disclose an interest in funding such $15 million on highly profitable terms, have it backwards.

2.        The issue before the Court is **_not_** whether the Private Funding Agreement is better than the Litigation Cost Advance **_assuming_** that the Committee wins the Allocation Dispute.   The objectors have it backwards when they complain about the settlement of the Allocation Dispute as a "cost" of the Litigation Cost Advance.   In fact, the Committee focused on the settlement of the Allocation Dispute, which involves hundreds of millions of dollars, not the proffered $15 million advance.   The Committee was under no pressure to negotiate a settlement to fund the Avoidance Action Trust since River Birch, and perhaps others, had already offered such funding in return for varying percentages of the Term Loan Avoidance Action.   The value of the proffered $15 million  – not losing a percentage of the Term Loan Avoidance Action to a private funder – was one factor appropriately considered by the Committee in its negotiations with the DIP Lenders.   *See* Mayer Declaration at ¶¶  22-23.

3.        The issue before the Court is whether to approve the settlement of the Allocation Dispute at 70% for unsecured creditors and 30% for DIP Lenders.   The settlement is reasonable and should be approved.

## **REPLY**

### A.        **The Settlement resulted from arms-length bargaining over a lengthy period of time.**

4.        On Friday, March 4, 2016 the DIP Lenders approached Committee counsel concerning the prospect of re-opening settlement discussions concerning the Allocation Dispute.   The DIP Lenders advised the Committee that they were interested in advancing the Avoidance Action Trust $15 million to finance the Term Loan Avoidance Action if the Allocation Dispute were settled at the same time.   *See* Mayer Declaration at ¶¶  14-15.

2

5.      Committee counsel conferred with members of the Committee on March 7 and 8, briefed them on the status of the Term Loan Avoidance Action and met, in person and telephonically with internal and external counsel to the DIP Lenders on March 9.  *Id.* at ¶¶ 15-16.

6.      On March 15, the Committee and Committee counsel met telephonically to discuss potential offers to the DIP Lenders as to a split of proceeds from the Term Loan Avoidance Action.  The Committee requested detail on a litigation budget from counsel to the Avoidance Action Trust.  *Id.* at ¶ 17.

7.      Committee counsel and DIP Lenders' counsel met telephonically on March 31, April 7, April 14 and April 20 to discuss potential settlement of the Allocation Dispute, resulting in a proposal that Committee counsel discussed with Committee members  on April 21-22, leading to Committee a counter-offer on April 22, a telephonic meeting among counsel on April 26 and a counter-offer from the DIP Lenders conveyed to the Committee on April 27.  *Id.* at ¶ 18.

8.      Committee members debated an appropriate response to the DIP Lenders' April 27 proposal for almost two weeks.  The Committee voted on May 9 to make a final counter-proposal to the DIP Lenders, conveyed to the DIP Lenders on May 10 and resulting in an agreement on major economic terms.  On May 17 the Committee voted to approve the settlement, subject to final documentation and to the Avoidance Action Trust and the DIP Lenders reaching agreement on the definitive terms of the Litigation Cost Advance.  *Id.* at  ¶ 19. Negotiations on definitive documentation continued through June and into July, culminating with execution of final documents and filing for Court approval on July 15.  *Id.* at ¶ 20.

## B.    The Settlement Meets the Iridium Factors and Should be Approved.

9.      In deciding whether a particular settlement falls within the "range of reasonableness," the Second Circuit Court of Appeals in *Iridium*  set forth a list of factors, including: (1) the balance between the probability of success in the litigation versus the concrete benefits of settlement; (2) the likelihood of complex and protracted litigation; (3) the paramount interests of creditors, including each affected class's relative benefits; (4) whether other parties in interest support the settlement; (5) the competency and experience of counsel supporting the settlement; and (6) the extent to which the settlement is the product of arms' length bargaining. *In re Iridium Operation LLC*, 478 F.3d 452, 462 (2d. Cir. 2007).  These factors overwhelmingly establish that the settlement is reasonable.

10.      With respect to *Iridium* factor (1) – "the probability of success versus the concrete benefits of settlement" --  a 70% settlement provides substantial concrete benefit.  The Committee remains confident it would prevail in the Allocation Dispute litigation, but recognizes that risk of loss remains.

11.      Davidson Kempner contends that it is unreasonable for the Committee to settle the Allocation Dispute because Bankruptcy Judge Gerber had rendered a decision in the Committee's favor.  *See* DK Objection at ¶ 24-26.  However, that decision was vacated as moot, its power as binding precedent is not clear, and it does not provide the guarantee of victory asserted by Davidson Kempner.

12.      In 2011, the Committee had the benefit of litigating the Allocation Dispute before Judge Gerber, who had detailed and relevant personal knowledge of the facts from presiding over the proceedings and entering the orders governing the Allocation Dispute.  While the Committee believes it would be appropriate for any new judge to defer to Judge Gerber's findings, the District Court might not share that view:

4

"I've got Judge Gerber as a witness recreating the negotiations for
80 pages.  And that's no good."

*Transcript of Oral Argument, U.S. Dep't of Treasury v. Official Comm. of Unsecured Creditors of Motors Liquidation Co., No. 12-cv-00695-CM (S.D.N.Y. May 4, 2012), Dkt No. 12* at 24 (referred to herein  as "**Hearing Tr.**").[2]  *See* Mayer Declaration at ¶  24.

13.     The Committee is also cognizant of  Judge Gerber's observation that the issues he disposed of on summary judgment "were much closer" than the issues posed by the motion to dismiss. *Official Comm. of Unsecured Creditors of Motors Liquidation Co. v. U.S. Dep't of the Treasury (In re Motors Liquidation Co.)*, 460 B.R. 603, 607 (Bankr. S.D.N.Y. 2011). *See* Mayer Declaration at ¶  24.

14.     The Objections assume that Judge McMahon would have affirmed Judge Gerber's decision on the merits.  Selectively quoting from the beginning of the transcript before the District Court, Davidson Kempner contends that there was "no indication . . . that Judge McMahon in any way disagreed with Judge Gerber's analysis."  DK Objection at ¶  9.  However, later during the oral argument Judge McMahon stated, "[d]on't call it my interpretation.  I haven't interpreted it yet.  I'm trying to see my way clear to not finding an ambiguity and not sending you back through trial." (Hearing Tr. at 23-24.)

15.     Equally significant, after oral argument, Judge McMahon issued an order directing the parties to respond to additional questions, including two on the merits.

16.     District Judge McMahon asked:

"The Borrower in the Wind-Down Order is Old GM.  (See R. 204.)
What is Old GM other than the Bankruptcy Estate?  Is there an Old
GM aside from the bankruptcy estate?"

17.      This question was raised in response to a new issue raised for the first time at appellate argument by counsel to EDC, who attempted to draw a distinction between the

---

[2] The transcript of the oral argument in the District Court was attached as Exhibit F to the Motion.

"Borrower/Old GM" and the Debtors' "estate." He argued that while the DIP Lenders agreed to limit their DIP Liens against certain assets of the Debtor/Old GM, they were still able to assert the superpriority claim against assets of the estate such as the avoidance action proceeds.

18.     Judge McMahon appeared intrigued by this question and each side filed a comprehensive response on this issue. *See* Mayer Declaration at ¶ 25. The Committee continues to believe that the DIP Lenders waived recourse against avoidance action proceeds and the distinction between debtor and debtor's estate has no bearing, but Judge McMahon's question indicates there is some risk that a court could view the matter differently. *Id.*

19.     The second question bearing on the merits was:

> "Is there any disagreement that the DIP lenders cannot be subject to cram-down under section 1129(b) of the Code, no matter what? If there is, speak now (and explain why) or forever hold your peace."

20.     This question related to the DIP Lenders' argument on appeal that their superpriority claim must have recourse because any other interpretation renders the superpriority claim meaningless. The Committee responded that the superpriority claim was not surplus because it exempted the DIP Lenders from cram-down. The DIP Lenders replied that other provisions in the DIP Order already exempted them from cram-down.

21.     The Committee continues to believe that the DIP Lenders' argument has no merit – the Committee specifically negotiated for limitation of recourse, and giving the DIP Lender recourse on any theory would nullify that limitation. However, Judge McMahon was sufficiently interested in the issue to ask the question above, and the Committee recognizes the risk that Judge McMahon, or the Court of Appeals, could accept the DIP Lenders' argument that the superpriority claim must have recourse even if the DIP Loan does not. *See* Mayer Declaration at ¶ 25.

22.     In sum:  the Committee continues to believe it would win the Allocation Dispute in bankruptcy court on re-trial, in district court upon initial appeal and in the Court of Appeals.  But the Committee also believes that winning is not a foregone conclusion.

23.     Davidson Kempner relies on the holding in one case, *In re Remsen Partners, Ltd.*, 294 B.R. 557, 571 (Bankr. S.D.N.Y. 2003), to support its position that the Committee should not have settled when it already had a judgment in its favor.  However, in that case the bankruptcy court rejected a proposed settlement by a chapter 7 trustee who was seeking to settle a claim of the debtor's estate for less than twenty percent of its estimated value, and leaving no recovery for unsecured creditors.  *Id.* at 563.  In sharp contrast, here the Committee is seeking to settle for 70 percent, not less than 20 percent as in *Remsen Partners*.

24.     With respect to *Iridium* factor (2) -- "the likelihood of complex and protracted litigation":  The Committee would, as a matter of civil procedure, have to start the Allocation Dispute from scratch, by filing a complaint.   Although District Judge McMahon did suggest that the Committee and the DIP Lenders could stipulate to the findings in Judge Gerber's order and the DIP Lenders' counsel agreed on appeal that there were no issues of fact, the DIP Lenders have not agreed to stipulate to Judge Gerber's order and a new judge might question – as Judge McMahon herself questioned -- whether parol evidence and a trial are necessary to resolve the dispute:

> "If this thing has to be tried, all your lawyers got to get on the stand. You've got to come up with all the drafts.  And you've got to testify about the course of the negotiations."

Hearing Tr. at  24.

>  "There's nothing in the record to explain that to me. And if there's something in the bankruptcy code or the four corners of the documents that explains that to me that's great. Otherwise, you got to go back and have a trial."

7

Hearing Tr. at 52.

> "If we have to get into that you are going to go back….If we have
> to get into people's intent, then there will have to be evidence
> about who said what to whom in the heated month of July 2009".

Hearing Tr. at  66.

25.     There is, in short,  no guaranty that re-litigating the Allocation Dispute
would be a clean and short process in bankruptcy court.

26.     Davidson Kempner argues that delay will not prejudice unsecured
creditors because there will not be proceeds to distribute until the avoidance action is completed.
The argument misses the point.  One unfortunate result of Judge McMahon's decision on
ripeness is that the Committee may not be able to re-start the Allocation Litigation until after this
Court completes what promises to be a lengthy trial on the Avoidance Action; it may even have
to wait until all appeals from this Court's judgment to the District Court, and then to the Court of
Appeals, are exhausted.  This will take years.  Any complaint filed by the Committee will go
through this Court and appeals in the District Court and the Court of Appeals.  This will take
more years.  If the Objectors have their way, the allocation dispute first raised in 2010 may not
be decided until the next decade.  The proposed settlement brings finality and certainty, and both
have value – there is no question but that the alternative to settlement would be years of
"protracted litigation."  *See* Mayer Declaration at ¶  26.

27.     With respect to Iridium factor (3) "the paramount interests of creditors"
and factor (4) "whether other parties in interest support the settlement," the settlement was
negotiated by the Committee, who is charged with "the paramount interest of creditors."  This is
relevant under *Iridium*.  The status of the Objectors is also relevant.  River Birch is the principal
funder under the rejected Private Funding Agreement and Davidson Kempner has an interest in
participating in the Private Funding Agreement.  Davidson Kempner also asserts that it holds an

interest in the Avoidance Action Trust, which does give it standing to object. However, Davidson Kempner has not disclosed how much it holds, making it impossible to determine whether Davidson Kempner is aggrieved by settlement of the Allocation Dispute or by its failed bid to profit through participation in the Private Funding Agreement.[3] The failure of any other creditor to object speaks in favor of the settlement of the Allocation Dispute.

28.    With respect to *Iridium* factor (5), the competency and experience of counsel supporting the settlement:  Committee counsel has been litigating the Allocation Dispute for almost six years; its general qualifications are set forth in its retention application and are known to the Court.  With due respect to counsel for the objectors, the Committee believes that their objection marks their first appearance in this bankruptcy case.

29.    Finally, with respect to *Iridium* factor (6) – "the extent to which the settlement is the product of arms' length bargaining":  the facts set forth above show that the settlement was indeed the subject of arm's length bargaining over a period of months.

### C.    The Court Has Authority to Approve the Settlement

30.    The Court has the authority to approve this settlement now.  Davidson Kempner argues that this Court should not determine the reasonableness of the proposed settlement because the District Court previously found that the Allocation Dispute was not yet "ripe" for adjudication.  *See* DK Objection at ¶ 23.

31.    "Ripeness" has no bearing on this settlement.  The Committee has struck a deal on the allocation of lawsuit.  The fact that the lawsuit may never have any value does not

---

[3]   The Committee sought such disclosure informally and also asked if Davidson Kempner hold GUC Trust Units.  A holder of GUC Trust Units wants the Avoidance Action Trust to lose, as victory would give the defendant Term Lenders dilutive claims against the GUC Trust.  If the Objectors hold a greater percentage of the GUC Trust Units than the Avoidance Action Trust Units, the Objectors would stand in the questionable position of financing a lawsuit they want to lose.

prevent the Committee from cutting a deal on the ownership of the lawsuit and does not preclude the court from deciding whether the deal is fair.  *See In re Elec. Books Antitrust Litig.*, 639 F. App'x. 724 (2d Cir. 2016) (Summary Order) (court can rule on fairness of a damages settlement before liability is established).

### D.     The Objections' Analyses are Flawed

32.     Both Objections attached charts comparing recovery to general unsecured creditors under the DIP Lenders' Litigation Cost Advance/settlement of the Allocation Dispute and the Private Funding Agreement with River Birch assuming the Committee prevails in the Allocation Dispute – completely irrelevant to the issue of whether the settlement is reasonable. The DK Objection also attaches a chart purportedly showing show that if the Term Loan Avoidance Action receives $1.5 billion from the Term Loan Defendants, the DIP Lenders would receive more than half of the amount they are owed.  That is also irrelevant.  The Court must determine whether the 70:30 allocation is fair to the unsecured creditor beneficiaries of the Avoidance Action Trust.  Whether such a settlement gives the DIP Lenders a 20-cent recovery on their own loan or a 50-cent recovery on their own loan has no bearing on the issue.

## CONCLUSION

33.     WHEREFORE, for the reasons set forth above and in the reply filed by the

Avoidance Action Trust in response to the Objections, the Committee respectfully requests that

the Court overrule the Objections and grant the relief requested in the Motion.


Dated:  August 5, 2016
        New York, New York

                              Respectfully submitted,

                              **KRAMER LEVIN**
                              **NAFTALIS & FRANKEL LLP**

                              /s/ Thomas Moers Mayer
                              Thomas Moers Mayer
                              Robert T. Schmidt
                              Jonathan M. Wagner
                              Jennifer Sharret
                              1177 Avenue of the Americas
                              New York, New York 10036
                              (212) 715-9100

                              *Attorneys for Official Committee of*
                              *Unsecured Creditors*