**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
In re:

MOTORS LIQUIDATION COMPANY, f/k/a
GENERAL MOTORS CORPORATION, *et al.*,

                                  Debtors.

Chapter 11

Case No. 09-50026 (MG)
(Jointly Administered)

---------------------------------------------------------------x
OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF MOTORS LIQUIDATION
COMPANY, *et al.*,

                                  Plaintiff,

- against –

UNITED STATES DEPARTMENT OF THE TREASURY
and EXPORT DEVELOPMENT CANADA,

                                  Defendants.

Adversary Proceeding
No. 11-09406 (MG)

---------------------------------------------------------------x

**DECLARATION OF THOMAS MOERS MAYER IN SUPPORT OF THE
JOINT MOTION OF THE MOTORS LIQUIDATION COMPANY AVOIDANCE
ACTION TRUST AND OFFICIAL COMMITTEE OF UNSECURED CREDITORS
FOR ENTRY OF (A) STIPULATION AND AGREED ORDER (I) SETTLING
DISPUTED ENTITLEMENTS OF DEBTOR-IN-POSSESSION LENDERS
AND OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO POTENTIAL
TERM LOAN AVOIDANCE ACTION PROCEEDS AND (II) MODIFYING
AVOIDANCE ACTION TRUST AGREEMENT TO IMPLEMENT SETTLEMENT,
AND (B) ORDER (I) APPROVING SETTLEMENT OF THE ALLOCATION
DISPUTE, (II) APPROVING AMENDMENTS TO THE AVOIDANCE ACTION
TRUST AGREEMENT, AND (III) AUTHORIZING THE AVOIDANCE ACTION
TRUST TO GRANT A LIEN TO THE DIP LENDERS
<u>AND REPLY IN RESPONSE TO OBJECTIONS TO THE MOTION</u>**

        I, THOMAS MOERS MAYER, under the penalty of perjury, hereby declare:

        1.     I am a member of Kramer Levin Naftalis & Frankel LLP ("**Kramer Levin**"), with responsibility for the firm's representation of the Official Committee of Unsecured

Creditors (the "**Committee**") of Motors Liquidation Company, (f/k/a General Motors Corp.) et al.

2.  The facts set forth in this declaration are based on my personal observation of the facts or on information from partners, associates or employees who reported to me in my capacity as the leader of the team representing the Committee.

3.  I submit this declaration (the "**Declaration**") in support of the reply (the "**Reply**") in response to objections to the Joint Motion (the "**Motion**") of the Motors Liquidation Company Avoidance Action Trust and the Committee for entry of (A) Stipulation and Agreed Order (I) settling disputed entitlements of debtor-in-possession lenders and the Committee to potential Term Loan Avoidance Action proceeds, and (II) modifying Avoidance Action Trust Agreement to implement the settlement, and (B) Order (I) approving settlement of the Allocation Dispute (II) approving amendments to the Avoidance Action Trust Agreement and (III) authorizing the Avoidance Action Trust to grant a lien to the DIP Lenders [Docket No. 42] and in further support of the Motion.[1]

A.  Background: The Final DIP Order and Wind-Down Order

4.  On June 3, 2009, the Committee was formed and retained professionals.

5.  Counsel to the Committee negotiated the Final DIP Order and the Wind-Down Order with the Debtors and the DIP Lenders. The Committee believed that under the Wind-Down Order, the Term Loan Avoidance Action would be prosecuted for the benefit of general unsecured creditors.

6.  In July 2010, during negotiations of the Debtors' proposed plan of liquidation, Treasury's counsel called Committee counsel and for the first time asserted that

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion and the Reply.

Treasury had an interest in and was entitled to any proceeds of the Term Loan Avoidance Action. Committee counsel participated in several calls with Treasury's counsel regarding this issue. In August 2010, counsel to the Debtors informed counsel to the Committee that pursuant Treasury's request, the proposed plan would provide that the beneficiaries of the Term Loan Avoidance Action would be determined at a later date.

7. In an effort to resolve the dispute, on October 4, 2010 the Committee filed a motion seeking to enforce the DIP Order and the Wind-Down Order, noting that the DIP Lenders could not claim rights to any proceeds of the Term Loan Avoidance Action [Bankr. Dkt. No. 7226]. The DIP Lenders opposed the motion. The Bankruptcy Court ruled on October 21, 2010 that the Committee's motion was not yet ripe for judicial adjudication, but did not foreclose a further application for a ruling at a later time [Bankr. Dkt No. 7642].

8. The Bankruptcy Court confirmed the Debtors' chapter 11 plan of liquidation (the "**Plan**") on March 29, 2011 [Bankr. Dkt. No. 9941]. The effective date of the Plan was March 31, 2011. The Plan provided for the creation of the Avoidance Action Trust.

9. The confirmed Plan and the Avoidance Action Trust deferred the issue as to whether the DIP Lenders or unsecured creditors would be the beneficiaries of the Avoidance Action Trust, providing that the Allocation Dispute would be resolved by either (i) mutual agreement between Treasury and the Committee, or (ii) Final Order. Plan § 1.124.

10. Under the Plan, the Committee survives for one purpose only: to continue prosecution or settlement of the Allocation Dispute.

B.   The Allocation Dispute

11. On June 6, 2011 the Committee commenced the Allocation Dispute, seeking a declaratory judgment that (i) the DIP Lenders were not entitled to any proceeds of the Term Loan Avoidance Action and had no interests in the Avoidance Action Trust, and (ii) the

3

holders of Allowed General Unsecured Claims had the exclusive right to receive any and all proceeds of the Term Loan Avoidance Action, and are the exclusive beneficiaries of the Avoidance Action Trust.  [Adv. Pro No. 11-09406, Dkt. No. 1].

12.     Thereafter, counsel to the Committee and counsel to the DIP Lenders engaged in settlement negotiations.  Coincidentally, counsel were in a negotiation session the day the Bankruptcy Court ruled in favor of the Committee in the Allocation Dispute on November 28, 2011 (the "**Bench Decision**").[2]

13.     On December 16, 2011, the DIP Lenders appealed the Bench Decision. The District Court heard oral argument concerning the Allocation Dispute on May 4, 2012.  On June 6, 2012, the District Court issued an order directing the parties to respond to additional questions.  On July 3, 2012 the District Court vacated the Bench Decision on the grounds that the dispute was not yet ripe and remanded the case to the Bankruptcy Court with instructions to dismiss the Committee's complaint without prejudice.

C.     Events Leading to the Settlement

14.     In March 2016, Committee counsel learned that the Avoidance Action Trust was exploring funding arrangements with various parties.  Around the same time, the DIP Lenders approached Committee counsel about re-opening settlement discussions with respect to the Allocation Dispute.  The DIP Lenders advised that they were considering providing the needed funding to the Avoidance Action Trust on an interest free-basis, but that they would do so only if the Allocation Dispute were settled at the same time.

---

[2] The Court issued an Errata Order with the Bench Decision on December 12, 2011 [Adv. Pro No. 11-09406 Dkt. No.30] and a Second Errata Order with the Bench Decision on January 10, 2012 [Adv. Pro No. 11-09406 Dkt. No. 37].

15. The DIP Lenders contacted Committee counsel on Friday March 4. On March 7 and 8, Committee counsel conferred with members of the Committee and briefed them on the status of the Term Loan Avoidance Action.

16. On March 9, internal and external counsel to the DIP Lenders met in person and telephonically with Committee counsel.

17. On March 15, the Committee and Committee counsel met telephonically to discuss potential offers to the DIP Lenders as to a split of proceeds from the term Loan Avoidance Action. The Committee requested detail on a litigation budget from counsel to the Avoidance Action Trust.

18. Committee counsel and DIP Lenders' counsel met telephonically on March 31, April 7, April 14 and April 20 to discuss potential settlement of the Allocation Dispute, resulting in a proposal that Committee counsel discussed with Committee members on April 21-22, leading to a Committee counter-offer on April 22. Committee counsel met telephonically with DIP Lenders' counsel on April 26 to discuss the counter-offer, which the DIP Lenders rejected with their own counter-offer. Committee counsel conveyed the DIP Lenders' newest offer to the Committee on April 27.

19. Committee members debated an appropriate response to the DIP Lenders' April 27 proposal for almost two weeks. The Committee voted on May 9 to make a final counter-proposal to the DIP Lenders. Committee counsel conveyed that response to counsel for the DIP Lenders on May 10, resulting in an agreement on major economic terms. On May 17, the Committee voted to approve the settlement, pursuant to which unsecured creditors would receive 70% of the proceeds of the Term Loan Avoidance Action and the DIP Lenders would

receive 30% of the proceeds, subject to final documentation and to the Avoidance Action Trust and the DIP Lenders reaching agreement on the definitive terms of the Litigation Cost Advance.

20. Negotiations on definitive documentation continued through June and into July, culminating with execution of final documents and filing for court approval on July 15.

21. During these negotiations, the Committee was aware that the Avoidance Action Trust was simultaneously negotiating the Private Funding Agreement with River Birch. The Committee understands that under the Private Funding Agreement, River Birch would loan $15 million to the Avoidance Action Trust in return for the greater of 2.25 multiplied by the amount of funds drawn or 4.75% of the aggregate proceeds of the Term Loan Avoidance Action. The Private Funding agreement did not settle the Allocation Dispute.

22. Because the Committee knew the Avoidance Action Trust had alternatives to the DIP Lenders' proposed financing, at no time did the Committee feel compelled to settle the Allocation Dispute in order to obtain financing from the DIP Lenders. The value of the $15 million proffered by the DIP Lenders – essentially, the value of not losing a percentage of the Term Loan Avoidance Action to private funders – was only one factor in the Committee's deliberations over any proposed settlement of the Allocation Dispute.

23. Under the Stipulation and Agreed Order and related Funding Agreement unsecured creditors and the DIP Lenders will split the proceeds of the Term Loan Avoidance Action 70/30, after deducting the $15 million repayment to the DIP Lenders. The Committee viewed the interest-free Litigation Cost Advance as a value add to the overall settlement. The 70/30 split under a settlement where the DIP Lenders provided the Litigation Cost Advance was

6

the functional equivalent of unsecured creditors receiving 72-73% of the proceeds where a private funder invested the $15 million in return for 4.75% of the Term Loan Avoidance Action.[3]

24.     While negotiations were ongoing with the DIP lenders, counsel for the Committee discussed with Committee members the legal and factual merits of the issues in the underlying Allocation Dispute. The Committee believed it was in a strong negotiating position because of Judge Gerber's Bench Decision, but recognized there were several risks if the Committee had to litigate the Allocation Dispute again.  Judge Gerber had noted that the issues on summary judgment were close and the Committee understood that there was a possibility that Judge Glenn might have to make an independent decision on the summary judgment motions if faced with a revived Allocation Dispute. And there was always a possibility that a different judge, who was not as familiar with the facts and all the negotiations, might have a different interpretation.

25.     In addition, although during oral argument Judge McMahon made several statements indicating that she was leaning towards the Committee's position, she also had concerns about the merits of some of the legal issues and the possible need for parol evidence and discovery.  After oral argument, Judge McMahon issued an order directing the parties to answer several questions, two of which touched on the merits of the Allocation Dispute as opposed to jurisdictional issues.  One of the questions, which asked about the difference between

---

[3] At a $1 billion recovery from the Term Loan Avoidance Action, $15 million equals 1.5% of the proceeds, which at a 70/30 split means unsecured creditor recovery is reduced to approximately 69% of the proceeds.  In a private funding deal, 4.75% of the proceeds would be given to the private funder, leaving 95.25% for unsecured creditors and the DIP Lenders to divide (or litigate over).  If the Avoidance Action Trust took the loan from a private funder, unsecured creditors would need 72.44% of the remaining proceeds in order to receive the same equivalent net 69% of the proceeds as they would receive in the settlement with the DIP Lenders.

"Old GM" and the "estate," was a result of a new argument raised by counsel to EDC during oral argument. While the Committee believes there should be no distinction that would require reversal of Judge Gerber's Bench Decision, this was a new issue that Judge Gerber had not considered. Another one of the questions, which asked if there was any disagreement that the DIP Lenders cannot be subject to cram-down, was a result of the arguments raised by the DIP Lenders in their briefs and at oral argument that the Bankruptcy Court erred in adopting the Committee's position that the super priority claim was not meaningless because it protected the DIP Lenders from cram down. While the Committee continues to believe that the DIP Lenders' argument has no merit and there is no theory that would nullify the DIP Lenders' limited recourse, the Committee recognizes the risk that the District Court or Court of Appeals could accept the DIP Lenders' arguments that the super-priority claim must have recourse even if the DIP Loan does not.

26. The Committee also considered the possibility of protracted litigation with the DIP Lenders. The DIP Lenders are governmental entities with deep pockets and thus the means to litigate the Allocation Dispute until all appeals are exhausted. While the Avoidance Action Trust does not have proceeds in hand today, given the current stage of the underlying Term Loan Avoidance Action it will have proceeds at some point in the future. Settling the Allocation Dispute now assures general unsecured creditors that they will receive 70% of the net proceeds of the Term Loan Avoidance Action.

27. In consideration of all these issues, the Committee believes that the settlement of the Allocation Dispute falls well within the range of reasonableness.

8

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed:   August 5, 2016
            New York, New York

_____
Thomas Moers Mayer